## JOHNSON v. CITY OF ALCOA.—145 S. W. (2d) 796.

Eastern Section. August 10, 1940.

Petition for Certiorari Denied by Supreme Court, December 14, 1940.

Kennerly & Key, of Knoxville, for plaintiff in error.

Goddard & Gamble, of Maryville, and R. R. Kramer, of Knoxville, for defendant in error.

PORTRUM, J. These are two cases tried together growing out of the same cause of action; the father, Hobart Johnson, sues as next friend of his infant son, Frank Johnson, to recover damages for personal injuries, and in his own right to recover medical expenses incident to the injury of the son sustained in a public swimming pool owned and operated by the City of Alcoa. The boy, while shallow diving at the edge of the pool, struck his head against an intake pipe covered with concrete and sustained serious injuries necessitating the expense of medical attention.

The declaration contains two counts, the first designating the physical condition of the pool and its maintenance and operation in such condition a public nuisance; the second, that the city in operating the pool was engaged in a proprietary function and not a governmental function, and it was liable for the acts of negligence of its officers and agents in constructing and negligently maintaining the pool with the intake pipe placed in a dangerous position.

Upon demurrer the second count was stricken from the declaration and the case permitted to go to the jury upon the first count.

At the conclusion of the evidence the trial judge sustained the motion of the defendant for peremptory instructions for the reason, first, that no nuisance had been established by the proof, and second, that the plaintiff's son was guilty of such gross contributory negligence as barred his recovery. The plaintiff seeks now a review of this holding.

The swimming pool in question was constructed by the city in the fall of 1930 and first opened for business during the summer of 1931. It was designed and constructed under the supervision of the defendant's city manager.

The pool was constructed by damming up a small stream and excavating its banks creating a lake of about 300 feet in length, with irregular banks which are at the widest point 80 feet in width. There is a paved walkway around the pool; the sides are walled up with concrete and some places with stone and concrete, and the entire bottom is covered with concrete. The bottom slopes from the edges to the center, in some places providing different depths for the patrons, and at other places the water is made deep at the wall on the bank to accommodate divers and deep water swimmers.

The principal intake pipe enters above the rim of the pool through an ornament in the shape of a fish head and the water pours into the fish's mouth and into the pool, but the pipe which inflicted the injury enters at the side and at the bottom of the pool which was about 14 inches below the water level at the time of the accident. The rim or wall of the pool at this place was about two to three feet in height. The bottom of the pool at this place slopes off from the wall in an open fan-shape increasing the depth of about 26 inches of water from the wall gradually toward the center of the lake. This afforded an adequate depth for small children. Near this intake pipe was a slide used by children to slide down into the water which was supported by a frame-work consisting of stilts or legs extending into the water. This intake pipe was a 12-inch pipe, entering on the floor of the pool about 26 inches from the top of the rim or wall, and it extended for six feet out into the pool sloping with the floor, a gradual slope of about four inches, which indicates the degree of the slope of the floor. This pipe was covered with concrete and what is described as a "butterfly" form, that is concrete was placed at the side and smoothed over the top and sides, making a mound of concrete covering the pipe. The pipe at the bank or rim was 14 inches under the water at the time of the accident, and at its mouth six feet away it was eighteen inches under the water, and the 12-inch pipe was resting on the bottom of the pool, which description pictures the condition existing at the time of the accident.

This pipe was used only for the purpose of letting unfiltered water from a higher lake into the pool in the wintertime to prevent freezing of the concrete. It was larger than necessary for a 2-inch nipple, or cutoff, had been placed in the mouth of the pipe and the mouth filled and plugged up with brick and concrete. The pipe could have served but one benefit, and that was to provide an additional pressure upon the water flowing through the 2-inch nipple.

As stated, the bottom slopes away in an open fan-shape and approximately 10 or 12 feet from the pipe the bottom of the pool at the rim or wall had acquired a depth of six feet, which is indicated upon a board placed at the edge of the wall where there was located a small diving board. The wall and rim at this place was made of concrete and was circular in form. In front of this pipe and built upon the bottom of the pool approximately 20 feet from the rim of the pool was a large diving structure with the ladder immediately opposite the mouth of the pipe, which rested upon the bottom of the pool and used by the patrons in ascending from the bottom and the water to the platform above and to the diving board upon the opposite side of the structure. The depth of the water permitted the patrons of small size to gain the ladder and mount upon the diving structure. The surface of the lake was well lighted by numerous large electric lights, but there is a dispute as to whether the intake pipe could be seen from the rim on the night of the accident because of the ripples upon the water. This conflict makes it necessary for this court to conclude that the intake pipe at the time of the accident was not visible from the rim.

Over the door of the entrance from the bath house to the pool was a large sign, about 2½ feet in length and about 15 inches wide with large letters printed thereon as follows: "Do not dive in shallow water or scuffle about the pool." On a pole near where this intake pipe enters the pool was another sign as follows: "Do not dive in shallow water."

Frank Johnson had been to and swam in this pool before the night of the accident; he was sixteen and one-half years of age, an expert swimmer, and he was familiar with the physical condition, and the sign prohibiting diving in shallow water, or he should have been, and is chargeable with this knowledge, since the ordinary prudent person would have acquired the knowledge. ". . . Plaintiff's contributory negligence was not determined by circumstances as they appeared to him, but is determined by whether an ordinarily prudent man would have regarded . . . and appreciated [the] condition." Hicks v. Herbert, 173 Tenn., 1, 113 S. W. (2d), 1197. In addition to this the plaintiff admits that he knew the water was shallow; he was an expert diver and it was his purpose to make a shallow dive which can be accomplished in shallow water if the diver is sufficiently expert.

██ ██ On the night of July 17, 1937, Frank Johnson, accompanied by his twin brother and a neighbor boy, Bill Warren, paid admission and entered the pool and swam and dived around for a while. Johnson and Warren decided to engage in shallow diving, using the shallow portion of the pool in preference to the deep portion (you can shallow dive in deep water as well as in shallow water without the incident risk), and they accomplished this by making a run along the edge of the pool, diving off the rim with a parallel course with the rim for such distances as they could maintain in the water. The execution of this dive is best described by the plaintiff Johnson himself, who testified as follows:

"Q. Now, Frank, as you made your dive which direction did you dive with reference to where Dick was? A. I dove towards him as near as I could.

"Q. You dove towards where Dick sat on the rim of the pool? A. Yes sir.

"Q. Had Bill Warren dived in the same direction? A. Yes sir, he had dived and just come up and I went in.

"Q. Where did Bill Warren leave the edge of the pool with reference to where you had left it? A. Just about the same place.

"Q. Do you know anything about the depth of the water in the region where Dick was swimming when you made the dive? A. Yes sir, I knew he came up some, that it got shallow.

"Q. Now, when you made that dive, Frank, what kind of a dive did you make? A. I made a flat dive. It was a running dive, and I hit right flat on the water.

"Q. Was it deep or shallow dive? A. It was a shallow dive. That is the reason I ran so that I could stay on top of the water.

"Q. In what position were your hands? A. Out this way (illustrating) so it would keep me up and keep me from going to the bottom.

"Q. What happened when you made the dive? A. I hit something headon and everything went black.

"Q. What part of your body was struck or hit? A. The top of my head; the whole top of my head. . . .

"Q. State whether or not you came in contact with the bottom of the pool before you received the blow on top of your head? A. I didn't touch anything, I just dived."

The plaintiff insists that since he could have executed the shallow dive in the shallow water but for the obstruction of the pipe, then, that the pipe is the sole cause of his injury for which the city must respond. He admits that it was his purpose to dive under the slide, heretofore described, and between its supports and that he knew the water was shallow, but he did not know how shallow. He struck the pipe near the bank or within two or three feet of the bank. The trial judge took the view that the boy, in engaging in this

hazardous sport in shallow water where he must have succeeded in performing the stunt to avoid injury, was guilty of such gross negligence as to bar his right of recovery. It is argued that his negligence is not the contributing cause, for if the pipe had not been there he would have in fact succeeded. We entertain the view that the defendant's negligence, in maintaining the pipe there, was not the prime cause; that the place was a safe place for a cautious diver—stated differently, a forbidden place for divers—since none but the reckless diver would attempt to execute a shallow dive at this place. And especially was the contributory negligence gross because it was in violation of a well-posted rule prohibiting diving in shallow water and the diver was chargeable with notice of the rule. The city was under no duty to make this particular place safe for shallow divers; it performed its duty when it made the rule and posted the signs prohibiting diving in shallow water. Necessarily it could not make the whole safe for diving from the rim of the pool, since there were other and younger patrons using the pool who must be accommodated with shallow water. There being no duty resting upon the city to make this particular place safe for divers, then it violated no civil duty owed to the diver who was engaged in this hazardous undertaking against its rule. The existence and maintenance of the pipe there was not the proximate cause of the plaintiff's injury. It is attributable solely to his own gross negligence.

But it is insisted that this accident is based upon the maintenance of a nuisance and that contributory negligence is no defense to a nuisance. This insistence is partially true, depending upon the character of the nuisance. If it is a nuisance designated in the books as an "absolute" nuisance, then there is authority to the effect that contributory negligence is not a defense. But if the nuisance grows out of and is founded upon negligence, or created by the negligent act or conduct of the creator, then contributory negligence is a valid defense. This distinction is clarified and illuminated in an opinion written by Mr. Justice Cardozo, while Chief Justice of the State of New York, in the case of McFarlane v. Niagara Falls, 247 N. Y., 340, 160 N. E., 391, 392, 57 A. L. R., 1. In that case he held that a projecture from the curb over a driveway formed by melted cement at a place where pedestrians passed from one place to another, in such a way as to be likely to cause them to fall, is a nuisance, but "Whenever a nuisance has its origin in negligence, one may not avert the consequences of his own contributory negligence by affixing to the negligence of the wrongdoer the label of a nuisance." (Quotation from the first headnote). In the opinion he gives certain illustrations of what is an absolute nuisance as distinguished from one having its origin in negligence. He uses the case of a factory emitting obnoxious gases over the neighborhood,

notwithstanding the owner had used every precaution to prevent it, as an absolute nuisance, for the owner has no right to discharge these gases upon third parties even if he be free from negligence. He held that the facts in the case under review stablished a nuisance originating from negligence, and that the contributory negligence was a defense. The facts in the case here under review are very similar, but stronger than the case Judge Cardozo was dealing with, for the City of Alcoa had no reason to anticipate that this shallow portion of the pool would be used for diving. It was not necessary to make it a safe place for diving, nor to warn the patron of the shallow depth when the patron knew that the water was shallow.

In the later case of Hoffman v. City of Bristol, 113 Conn., 386, 155 A., 499, 75 A. L. R., 1191, this doctrine is reviewed and discussed, wherein the McFarlane case, supra, was analyzed. It holds in the case of an absolute duty, therein defined, that contributory negligence is no defense unless the negligence of the plaintiff is extreme. These A. L. R. headnotes express the holding as follows:

"Where a nuisance causing a personal injury is not grounded on negligence, but is absolute, the fault on the part of the plaintiff, which will bar the recovery, is a fault so extreme as to be equivalent to invitation of injury, or at least indifferent to consequences."

██ As Judge Cardozo expresses the thought the acceptance of the risk is a good defense against an absolute nuisance. This same doctrine is in force in this state under like principles, but it is designated gross contributory negligence on the part of the plaintiff. When the defendant's negligence is gross, he cannot rely upon the contributory negligence of the plaintiff. Consolidated Coach Co. v. McCord, 171 Tenn., 253, 102 S. W. (2d), 53. And in those cases where the defendant is required to expect and anticipate the negligence of the plaintiff (Last Clear Chance Doctrine), it is relieved of failure to perform this duty where the negligence of the plaintiff is gross. Southern Railway Co. v. Whaley, 170 Tenn., 668, 98 S. W. (2d), 1061. This case defines what amounts to gross negligence as a matter of law, and that a normal intelligent thirteen-year-old child is chargeable with gross negligence as a matter of law. The case was taken from the jury and dismissed, since the law imputed to her conduct a degree of gross negligence.

██ The case last cited is similar to the situation we have here; the defendant relied upon the contributory negligence of the plaintiff, and was answered by the contention that contributory negligence was no defense since it was the defendant's duty to expect and anticipate the negligence of the plaintiff, and the court held that the plaintiff's negligence being gross, it was a defense. The application of the same rule is appropriate in this case.

There are other assignments of error which become immaterial in view of the court's conclusion that the plaintiff was guilty of gross contributory negligence in accepting the risk when he undertook the performance of this hazardous sporting feat.

Affirmed.