Mark Newell UNDERWOOD,
Plaintiff/Appellee,

v.

WATERSLIDES OF MID–AMERICA, INC., et al., Defendants/Appellants.

Robert Craig WILLIAMS,
Plaintiff/Appellee,

v.

WATERSLIDES OF MID–AMERICA, INC., et al., Defendants/Appellants.

WATERSLIDES OF MID–AMERICA, INC., Plaintiff/Appellee,

v.

WILKINSON & SNOWDEN DEVELOPMENTS, INC., et al., Defendants/Appellants.

Court of Appeals of Tennessee, Western Section, at Jackson.

March 26, 1991.

Permission to Appeal Denied by Supreme Court Nov. 4, 1991.

Ben Todd, Memphis, for plaintiff/appellee Mark Newell Underwood.

Steven C. Grubb, Memphis, for plaintiff/appellee Robert Craig Williams.

Leo Bearman, Jr., Jill M. Steinberg, Memphis, for defendant/appellant Michael F. Saliba.

John R. Cannon, Jr., Memphis, for defendant/appellant Wilkinson & Snowden Developments, Inc.

Albert C. Harvey, Robert L. Moore, Memphis, for defendant/appellant & plaintiff/appellee Waterslides.

HIGHERS, Judge.

This appeal arises from a consolidation of three cases which were brought to trial after the collapse of a waterslide in Shelby County, Tennessee. Two of the consolidated cases were personal injury cases filed by persons who were on the waterslide when it collapsed. The third case was filed by one of the defendants in order to obtain indemnity or contribution from the others for settlements which had been made with other injured parties. A jury trial was held in the Circuit Court at Shelby County and the jury returned a verdict in the personal injury cases in favor of both plaintiffs. An

order was entered by the trial court finding that the defendant who paid the settlements is entitled to contribution from two of the other defendants. The defendants appeal the jury verdict on issues regarding the court's failure to grant a directed verdict, jury instructions, admission of evidence, and amount of the verdict. The defendants that were ordered to pay contribution raise on appeal the issue whether more than three of the six defendants ought to be responsible for the contribution.

Because there are numerous parties involved in this litigation, a brief explanation of the parties is necessary. Originally, the claims of numerous plaintiffs who were injured when the waterslide collapsed were consolidated to be heard at one trial, but only two of the plaintiffs went to trial, the rest settled. The two remaining plaintiffs are Mark Newell Underwood (Underwood) and Robert Craig Williams (Williams) both of whom were employees of Libertyland at the time of the accident. Originally there were nine named defendants, but by the time of trial, only six defendants remained. The remaining defendants are as follows: (1) Waterslides of Mid–America, Inc. (Waterslides) is the owner and operator of "Waterworks Waterslide" (the waterslide), an amusement ride located in Shelby County, Tennessee. (2) Grover C. Watkins, Inc. (Watkins) and (3) Funrides, Inc. (Funrides) are both Kentucky corporations of which Carlton Watkins is president. Watkins is a corporation which manufacturers amusement rides for parks and carnivals. Funrides is a sales and leasing company. The people who began Waterslides and built the slide traveled to Kentucky to see Carlton Watkins and learn how Watkins' waterslides were built and operated. Waterslides consulted with Watkins regarding the running of a waterslide facility. Waterslides contracted with Watkins and Funrides to buy the design and parts for the waterslide. Watkins and Funrides purchased various parts necessary for the waterslide and had them shipped to Memphis. (4) Almo of Georgia, Inc. (Almo) is a Georgia corporation which manufactured and sold certain fiberglass components to Wat-

kins and Funrides and they in turn shipped the fiberglass components to Tennessee. A company called Waterforms actually made the fiberglass for the flumes. (5) Wilkinson & Snowden Developments, Inc. (Wilkinson & Snowden) was hired by Waterslides to construct the waterslide. (6) Michael Saliba (Saliba) is a consulting engineer who was retained by Wilkinson & Snowden to review the plans and structural drawings for the waterslide before beginning construction. Saliba reviewed the plans and approved them, and the waterslide was built. Saliba also inspected the waterslide after it was constructed.

On June 26, 1980, "Waterworks Waterslide" was the location of a private party held exclusively for Libertyland employees from 10:00 p.m. until midnight. The party was held after normal operating hours and fifty to seventy-five Libertyland employees attended. Most of the employees paid a $1 admission fee. Allegedly three persons were hired by Waterslides to act as lifeguards or to supervise the activity on the waterslide the night of the accident. One person was to stand at the top of the slide and someone else at the bottom where the receiving pool is located. There is a sign at the top of the slide stating the rules for sliding down the waterslide. Those rules include, "no more than two people in a chain," "no stopping on the flumes," and "no trains." There is also a "wait and go" light at the top of the slide to tell sliders when to wait and when to slide, but there is some dispute as to whether that light was functioning on the evening of the accident.

Throughout the evening various people were sliding in chains of more than two people at a time. As the party was winding down someone began a chain that was intended to be the largest chain of the evening. This chain was made of a record twenty-one people. When Williams went to the top of the slide, he did not see the chain that was forming below. Shortly after he slid down and was stopped by the chain, Underwood slid down and hit Williams in the back. Only a few seconds later, those in the chain heard a cracking sound and they fell about forty feet to the ground.

Williams suffered injuries to his right arm and left leg and Underwood suffered injuries to his left wrist.

Numerous parties brought suit against various defendants. Many of the suits were consolidated and Waterslides settled with all but two of the plaintiffs before trial. Prior to trial, three defendants were dismissed leaving six defendants to go before the jury. Default judgments were rendered against Almo, Watkins and Funrides. The jury returned a verdict in favor of Williams for $200,000 and a verdict in favor of Underwood for $100,000 against defendants Waterslides, Wilkinson & Snowden, and Saliba. The trial court ordered a remittitur in Underwood's verdict to $60,000 and in Williams verdict to $125,000. The trial court ordered that Waterslides was entitled to contribution from the appropriate joint tort-feasors. However, later the court ruled that the only appropriate joint tort-feasors responsible for contribution to Waterslides are Wilkinson & Snowden and Saliba. In regard to the suits for personal injuries, defendants appeal on issues of directed verdict, jury instructions, admission of evidence and amount of the verdict. Regarding the case for contribution, defendants appeal regarding which defendants are responsible for contribution. We affirm in part and reverse in part as set forth below.

## I. PERSONAL INJURY CASE

### A. DIRECTED VERDICT

The first issue raised is whether the trial court erred in failing to direct a verdict in favor of defendant, Wilkinson & Snowden, as a matter of law on the grounds that the plaintiffs were guilty of proximate contributory negligence and that Waterslides was an independent intervening cause relieving the defendant Wilkinson & Snowden of liability.

�In considering on appeal defendants' motion for directed verdict, we are governed by the rule that it is the duty of the appellate court in looking at the evidence, to discard all the countervailing evidence and take the strongest legitimate view of the evidence for the plaintiffs, and to allow all the reasonable inferences from it in their favor. *Jones v. Zayre, Inc.*, 600 S.W.2d 730 (Tenn.App.1980). If there is any dispute as to any material determinative evidence or any doubt as to the conclusion to be drawn from all the evidence, then the motion must be denied. *Id.* Accordingly, at the trial level, a motion for a directed verdict should be cautiously and sparingly granted because to do so deprives the non-moving party of a determination of the facts by a jury. A directed verdict is proper only when there is no controversy as to any material fact that would be determinative or when the evidence presented is clear and not conflicting such that there is only one inference that a reasonable person could make. *McCormick v. Waters*, 594 S.W.2d 385 (Tenn. 1980). We find that the trial court did not err in failing to direct a verdict for Wilkinson & Snowden because there is conflicting material evidence regarding proximate contributory negligence and independent intervening cause.

▐ First, Wilkinson & Snowden argues that it is entitled to a directed verdict because the plaintiffs were guilty of proximate contributory negligence as a matter of law due to plaintiffs' failure to follow well posted rules prohibiting their actions. However, we find conflicts in the material evidence determinative of this issue. There is some dispute as to whether or how often supervisors from Waterslides were posted at the top of the slide the evening of the accident to enforce the rules for sliding. The CEO of Waterslides, testifying on behalf of Wilkinson & Snowden, explained that Waterslides has someone posted at all times both at the top and the bottom of the slide. These supervisors are instructed as to the rules and regulations and they are posted at the waterslide to enforce the rules for the safety of the sliders. Mr. Brixey, one of the persons in charge of the waterslide on the night of the accident, testified that, in fact, there were two supervisors posted on the waterslide, one at the top and one at the bottom, during the Libertyland party. However, there is also evi-

dence that no one was supervising the sliders or enforcing the rules. Underwood testified that the person who was designated by Mr. Brixey as the supervisor at the top of the slide was sliding "all night long" and no one else was posted at the top of the slide. In addition, there is evidence that the supervisor for the bottom of the slide was also failing to supervise. Williams testified that Mr. Brixey was the only supervisor he saw that night. One of the supervisors admits to having slid during the party. There is considerable controversy as to whether anyone was posted to inform sliders of the rules governing sliding on the waterslide.

One of the rules for sliding was enforced by an illuminated sign posted at the top of the slide that read either "wait" in red or "go" in green to instruct sliders when to begin their descent. The purpose of the sign was to space the sliders at a safe distance and to be sure that the slide did not become overloaded. There is conflicting testimony as to whether the sign was in operation during the party. Both Underwood and Williams testified that the "wait and go" sign was not working on the night of the accident, but one of the supervisors of that night testified that the lights on the sign were working. Both the illuminated signs and the supervisors are safety measures employed by Waterslides to inform sliders of the rules of sliding, and if these measures were not in effect, sliders may not have been adequately informed. Thus, there is considerable controversy as to the facts that are material and determinative of the issue of contributory proximate cause and the court did not err in failing to grant a directed verdict on that issue.

Second, Wilkinson & Snowden argues that it is entitled to a directed verdict because Waterslides was an independent intervening cause of the accident. If we take the strongest legitimate view for Waterslides and discard all the countervailing evidence, we find that there is a dispute as to the cause of the waterslide's collapse and as to whether the actions of Waterslides are an intervening cause of the collapse. Specifically, two experts testified that the collapse was due to faulty construction. They said that the holes for the bolts which held together sections of the flume were not drilled correctly, and there were no steel supports on both sides of the joints. This evidence creates a dispute as to the material evidence on intervening cause. Therefore, we affirm the trial court's denial of the motion for a directed verdict.

## B. JURY INSTRUCTIONS

Both Wilkinson & Snowden and Saliba raise issues regarding whether the trial court committed reversible error in failing to instruct the jury regarding certain matters. Both defendants submitted to the trial court Special Jury Instruction Requests on the theories of contributory negligence, and independent intervening cause. Saliba submitted special requests on assumption of the risk and Wilkinson & Snowden raised the issue in their motion for a new trial. All of these special requests were denied by the trial court. Both defendants assert that the trial court erred in failing to instruct the jury regarding contributory negligence, assumption of the risk and independent intervening cause.

### 1. CONTRIBUTORY NEGLIGENCE

The trial court denied both defendants' Special Jury Instruction Requests regarding contributory negligence on the grounds that there is no evidence in the record to support giving such instruction, and the accident was not foreseeable by the plaintiffs. The trial court explained its reasoning in a discussion with counsel regarding the proposed jury instructions:

[T]he Court could not get around its conclusion that no matter which way I looked at it, from whatever angle, that any conduct of either one of these plaintiffs could have been either a direct or contributing cause to this slide falling and their resulting injuries or that they could have foreseen that if they broke those rules that they would be harmed, especially when all of the evidence is the fact that the rules were never intended

to prevent any harm except as they were exiting the bottom of the slide.

\* \* \* \* \* \*

And the Court can come to no other conclusion than that there's no evidence in this record on which reasonable minds can differ that any conduct of the plaintiffs out there would rise to the dignity of direct and proximate or even a contributing factor in the cause of this injury.

We disagree with the trial court's finding.

■ The rule in Tennessee is that the trial court should instruct the jury upon every issue of fact and theory of the case raised by the pleadings and supported by the proof. *Street v. Calvert*, 541 S.W.2d 576 (Tenn.1976). More specifically, where a special instruction that has been requested is a correct statement of the law, is not included in the general charge, and is supported by the evidence introduced at trial, the court should give the instruction. *Tennessee Farmers Mut. Ins. Co. v. Hinson*, 651 S.W.2d 235 (Tenn.App.1983). When the denial of a request which ought to have been given prejudices the rights of the requesting party, the judgment should be reversed. *Nashville C. & St. L. Ry. Co. v. Jackson*, 187 Tenn. 202, 213 S.W.2d 116 (1948). We find that the trial court's failure to instruct the jury on the theory of contributory negligence is reversible error.

■ Contributory negligence occurs when a plaintiff breaches the duty imposed upon him to exercise ordinary care for his own safety. See *Parker v. Warren*, 503 S.W.2d 938 (Tenn.App.1973); *Donaho v. Large*, 25 Tenn.App. 433, 158 S.W.2d 447 (1941). Where a rule of conduct is laid down for safety reasons, the rule establishes the standard of ordinary care, and one who violates it cannot be said to have exercised ordinary care and ought to have anticipated some injury from its violation unless compliance would have been impossible or would have subjected one to other dangers. *Standridge v. Godsey*, 189 Tenn. 522, 226 S.W.2d 277 (1949).

■ There is sufficient evidence in the record to warrant an instruction on contributory negligence. There were numerous safety rules posted at the waterslide which plaintiffs testified they saw and chose to ignore. Underwood testified that he had been to that particular waterslide five, six or seven times before the night of the accident and he remembered the "wait and go" lights and the rules posted at the top of the slide. Underwood understood that one of the rules was that no more than two people were to be on a slide at a time. On previous visits, Underwood had seen supervisors actually step in front of people to stop them from sliding in chains of more than two people. Underwood further testified that although he does not recall reading the sign, he was aware that one of the rules was no stopping on the flumes.

In addition to being aware of the rules, there is evidence that Underwood blatantly ignored them. Ken Brixey, who was supervising the waterslide that night, testified that on one occasion after seeing people slide in a chain, he spoke with Underwood about not sliding in chains anymore. Underwood testified that after listening to Mr. Brixey, he slid in chains of larger than five or six people about ten more times. In spite of the signs and the verbal warning from Mr. Brixey, Underwood said he stood at the top of the platform and counted the number of people forming a chain on the waterslide before he joined them for the last slide of that night. He was the twenty-first person to join the chain before the waterslide collapsed.

Likewise, Williams testified that although he had never been to the waterslide before, he saw the rules sign at the top of the slide and he heard Mr. Brixey instruct them to keep the chains down to four or five people. Williams remembers seeing the rules stating "no more than two at a time," and he was aware that the rule was being violated.

In addition to the evidence proving that the plaintiffs were aware of the safety rules and consciously chose to violate them, there is evidence that their violation of the rules may have caused the waterslide to collapse. One of the stockholders of Waterslides, testified that the purpose of the

"wait and go" lights was to make sure that there was no overload of the slide. Furthermore, several experts testified that the collapse of the waterslide was caused, at least in part, by the overload of people on the fiberglass flume. This evidence raises a question as to whether plaintiffs' contributory negligence was the proximate cause of the accident.

█ The trial court reasoned that the plaintiffs could not be found contributorially negligent because they could not foresee the accident which occurred. However, in order to find contributory negligence, it is not necessary that the plaintiff foresee the exact manner in which the danger to which he has subjected himself will arise. In an action for negligence, the liability of the tort-feasor is not limited to injuries which he could foresee, but extends to whatever injuries were "within the reasonable range of risk" created by the negligent act or omission. *Inter–City Trucking Co. v. Daniels,* 181 Tenn. 126, 178 S.W.2d 756 (1944). Similarly, it is a well established rule that in a personal injury suit, whether the plaintiff was contributorially negligent is not determined by the circumstances as they appeared to him, but rather, by whether an ordinarily prudent man would have regarded and appreciated the dangerous condition. *Hicks v. Herbert,* 173 Tenn. 1, 113 S.W.2d 1197 (1938); *Johnson v. City of Alcoa,* 24 Tenn.App. 422, 145 S.W.2d 796 (1940). The test of foreseeability is an objective one and the plaintiff's liability is only limited by whether an ordinarily prudent person would perceive a dangerous condition given the same circumstances, rather than whether these plaintiffs knew the exact danger to which they were subjecting themselves.

█ There is evidence upon which reasonable men could differ as to whether the plaintiffs were contributorially negligent. Thus, intelligent minds could draw different conclusions as to whether the plaintiffs' conduct was that of an ordinarily prudent man under the circumstances and the question of their contributory negligence should be left to a jury. See *Schindler v. Southern Coach Lines,* 188 Tenn. 169, 217 S.W.2d 775 (1949). Where an error that is not harmless has been committed regarding jury instructions, it is the obligation of the appellate court to reverse the matter and remand it for proper consideration under proper instructions. *Holder v. Martin,* 219 Tenn. 165, 407 S.W.2d 461 (1966). Therefore, we reverse and remand for a new trial and for the trial court to instruct the jury on the theories of contributory negligence and remote contributory negligence. See *Cardwell v. Golden,* 621 S.W.2d 774 (Tenn.App.1981).

## 2. ASSUMPTION OF THE RISK

█ Wilkinson & Snowden and Saliba assert that the trial court committed reversible error by failing to charge the jury on the theory of assumption of the risk. Both defendants rely on the case of *Overstreet v. Norman,* 44 Tenn.App. 343, 314 S.W.2d 47 (1957), in which a woman sued her employer for injuries sustained when she stepped from a truck bed down onto an upside down bean hamper which overturned causing her to fall. The court in *Overstreet* states that because reasonable minds might well differ as to whether the plaintiff knew the danger of stepping on to a bean hamper, the questions of assumption of the risk and contributory negligence are for the jury. *Id.* at 350, 314 S.W.2d at 51. However, we distinguish *Overstreet* from the case at bar because reasonable minds could not differ as to whether Williams and Underwood knew that their individual actions would likely cause the collapse of the waterslide. It is significant that "assumed risk" and "contributory negligence" are distinct doctrines of law and are not synonymous. *Wilson v. Moudy,* 22 Tenn.App. 356, 123 S.W.2d 828 (1938). Unlike contributory negligence, assumption of the risk requires actual knowledge of the danger and intelligent submission to it, whereas contributory negligence is a matter of some fault or departure from the standard of reasonable care. *O'Brien v. Smith Bros. Engine Rebuilders, Inc.,* 494 S.W.2d 787 (Tenn.App.1973). In order to be guilty of assumption of the risk, the plaintiff must discover the defect or danger, fully understand the danger presented

to him, and disregard the known danger by voluntarily exposing himself to it. *Ellithorpe v. Ford Motor Co.*, 503 S.W.2d 516 (Tenn.1973). The evidence shows that although the plaintiffs knew they were potentially subjecting themselves to some danger, they did not know the precise manner of danger to which they were at risk. Assumption of the risk requires a subjective test rather than the objective test imposed by contributory negligence. A necessary element to assumption of the risk is that the plaintiff must not only know the facts which create the danger but he must comprehend and appreciate the danger. *Haga v. Blanc & West Lumber Co., Inc.*, 666 S.W.2d 61 (Tenn.1984). It has long been the rule that unless there is evidence to support the charge, the party is not entitled to the charge. We do not find proof in the evidence that the plaintiffs fully recognized the danger to which they were subjecting themselves and which ultimately caused their injuries. Therefore, we find no error.

### 3. INTERVENING CAUSE

Wilkinson & Snowden and Saliba also propose that the trial court erred by failing to charge the jury on the theory of intervening cause. The law of intervening cause is such that one who does nothing more than furnish the condition by which an injury is made possible, i.e., constructing a waterslide with potential defects, is not liable if there intervenes a distinct and unrelated cause of the injury. See *Louisville & N.R. Co. v. Head*, 46 Tenn.App. 612, 332 S.W.2d 682 (1959). Both defendants contend that they are not liable because of Waterslides' intervening act of negligently failing to provide adequate supervision of the sliders and thus allowing twenty-one people to form a chain on the waterslide and ultimately, causing the collapse of the waterslide. In order to be an intervening act, the event must be sufficient itself to stand as the cause of the injury, and be one but for which the injury would not have occurred. If the new event merely accelerates an original cause which was sufficient to produce the injury, the first cause will remain the proximate cause.

*Read Phosphate Co. v. Vickers*, 11 Tenn. App. 146 (1930). The essence of the rule as to independent intervening cause is whether the subsequent successive acts and injuries were probable and therefore to be anticipated. *International Harvester Co. v. Sartain*, 32 Tenn.App. 425, 222 S.W.2d 854 (1948). Our Supreme Court has explained that the test of liability under the law of intervening cause requires a person to anticipate or foresee what would normally happen; one is not required to anticipate and provide against what is unusual or unlikely to happen, or that which is only remotely possible. *Ward v. University of the South*, 209 Tenn. 412, 354 S.W.2d 246 (1962). It is reasonable for Wilkinson & Snowden and Saliba to have anticipated that there would be times when the supervisors would not be able to watch all of the sliders all of the time, and as a result, rules may be broken. Likewise, it is reasonable that Wilkinson & Snowden and Saliba should have anticipated that on occasion, more than two people would slide on the waterslide at the same time. However, reasonable minds may differ as to whether either defendant should have anticipated the occurrence of twenty-one persons in a standstill on the waterslide all at the same time.

The evidence shows that Waterslides' employees failed to maintain proper control of the waterslide as required by the rules. There is also evidence that if Waterslides' employees had enforced the rules, there would not have been twenty-one persons on the waterslide at the same time. Finally, experts testified that the weight on the waterslide was at least a contributing factor to its collapse. We find that there is evidence to support a jury instruction on the theory of intervening cause and therefore we reverse the ruling of the trial court and direct on remand that such instruction be given.

### 4. SCOPE OF SALIBA'S RESPONSIBILITY

Defendant Saliba asserts that the trial court committed reversible error when it denied all five of his Special Jury Instruc-

tion Requests regarding the scope of his responsibility to Wilkinson & Snowden.

Saliba argues that his responsibilities to Wilkinson & Snowden were limited to the structural towers and foundation of the waterslide which did not include the flumes, which were pre-engineered. Wilkinson & Snowden asserts that Saliba was responsible for the entire waterslide because Saliba was to sign and seal the plans to be sure the structure was sound and that it would be built in a sound manner. Mr. Snowden, president of Wilkinson & Snowden, testified that Saliba's responsibilities specifically included the attachments between the tower and the flume, the structural support for the flume and the flume attachments themselves. Saliba signed and sealed the plans which included pictures of the flume. The contract between Wilkinson & Snowden and Saliba was oral.

The rule is that a party is not entitled to a particular charge unless there is evidence to support the charge. See *Wallace v. Knoxville's Community Dev. Corp.*, 568 S.W.2d 107 (Tenn.App.1978). Likewise, it is reversible error for the trial court to fail to charge the jury on issues that are supported by the evidence and which were not covered in the general charge. See *Tennessee Farmers Mut. Ins. Co. v. Hinson*, 651 S.W.2d 235 (Tenn.App.1983). The determinative question is whether there exists evidence to support jury instructions defining the scope of Saliba's responsibilities to Wilkinson & Snowden.

Because the contract between Saliba and Wilkinson & Snowden was oral, the only evidence as to what was in the contract must come from Saliba and representatives of Wilkinson & Snowden. The only evidence that the scope of Saliba's responsibilities was limited to the structural tower and foundation is found in his own testimony. Thus, the scope of Saliba's responsibilities as defined by the contract is virtually one party's word against the other's, and it is a question for the jury to decide. Therefore, we find that an instruction to the jury on that matter would be appropriate. On remand the trial court should instruct the jury as to the consequences if they find that the scope of Saliba's responsibilities to Wilkinson & Snowden was limited only to the foundation and structural tower.

### 5. TESTIMONY OF TOM EBRO

Both Wilkinson & Snowden and Saliba raise the issue that the trial court failed to instruct the jury as to the scope of Tom Ebro's testimony after the court promised to do so. Ebro was called as a witness for the plaintiffs and he was qualified by the trial court solely on the issue of water safety. Counsel for both Wilkinson & Snowden and Saliba requested that the court instruct the jury prior to Ebro's taking the stand that his testimony was only to be considered regarding matters of water safety and his testimony was not being offered against defendants Wilkinson & Snowden or Saliba. The court denied the instruction prior to Ebro's testimony, but after Ebro testified, on two separate occasions the trial court informed counsel, outside the hearing of the jury, that the court would charge the jury regarding the limited scope of Ebro's testimony. Specifically the court said:

> The court will instruct the jury that his testimony has nothing whatsoever to do with the construction by ... Wilkinson & Snowden or by the design by the engineer, Mr. Saliba. I will tell the jury that his opinion goes only to the operation of the waterslide by Waterslides of Mid–America, Inc.

However, when the court charged the jury there was no instruction regarding the scope of Ebro's testimony nor against which defendants his testimony was to be considered.

According to T.R.Civ.P. 51.01, the trial court must inform counsel of its proposed action upon any Special Jury Instruction Requests prior to counsel's arguments to the jury. See *Moredock v. McMurry*, 527 S.W.2d 462 (Tenn.1975). It is true that the court's failure to abide by this rule does not automatically demand reversal in every case. *Id.* at 463. However, reversal is required if material prejudice is shown to exist. *Id.* at 464.

■ The trial court mentioned on numerous occasions the fact that Ebro was certainly not qualified to testify regarding matters of the design and construction of the waterslide and the trial court promised to give an instruction to that effect which leads us to believe that the trial court thought such instruction was necessary so as not to prejudice defendants Wilkinson & Snowden and Saliba. It appears that Ebro did testify on some matters that border on issues of engineering and construction. Therefore, we find that the court's failure to include an instruction regarding the limiting scope for which Ebro's testimony was offered was prejudicial and reversible error. We reverse and remand and direct the trial court to give an instruction explaining to the jury that Ebro's testimony is not being offered against either defendants Wilkinson & Snowden or Saliba.

## C. ADMISSION OF EVIDENCE

All three defendants, Wilkinson & Snowden, Saliba and Waterslides raise issues regarding the trial court's admission of/or failure to admit certain evidence at trial.

### 1. TESTIMONY OF STANLEY WEISS

Wilkinson & Snowden and Saliba each raise the issue of whether the trial court committed prejudicial error by allowing Stanley Weiss to testify as an expert against them. Weiss was called as a witness for Waterslides and he was qualified by the court as an expert in the fields of metallurgical and materials engineering. Saliba and Wilkinson & Snowden submit that it was prejudicial error for the court to allow Weiss' testimony because Weiss stated that he was not familiar with the standard of care for contractors and engineers in Shelby County, Tennessee. (R 931, 934) We find that admission of Weiss' testimony was not prejudicial error.

■ The qualifications necessary to allow a witness to testify as an expert rest within the discretion of the trial judge. *Kinley v. Tennessee State Mut. Ins. Co.*, 620 S.W.2d 79 (Tenn.1981). The appellate court will not reverse the judgment of the trial court regarding whether a witness is an expert unless it is clear that the trial court was in error with respect to the witness' qualifications and that such error was prejudicial. *Benson v. Fowler*, 43 Tenn. App. 147, 306 S.W.2d 49 (1957).

■ Saliba and Wilkinson & Snowden assert that admission of Weiss' testimony against them was prejudicial because he is not familiar with the standard of care for engineers and contractors in the community. In support of their argument, defendants cite examples of experts in medical and legal malpractice cases in which courts have held that experts must be familiar with or from the community in which they are testifying. See *Sutphin v. Platt*, 720 S.W.2d 455 (Tenn.1986); *Cleckner v. Dale*, 719 S.W.2d 535 (Tenn.App.1986). Defendants then assert that Tennessee has held in effect that the same standard of care is applicable to the conduct of all compensated professionals such as accountants, doctors, lawyers, architects, engineers and others. *Delmar Vineyard v. Timmons*, 486 S.W.2d 914, 920 (Tenn.App.1972). We do not find that this is a correct statement of the law in Tennessee.

Defendants are correct that experts testifying in medical and legal malpractice cases in Tennessee are required to be familiar with the standard of care in the community in which they are testifying. However, in medical malpractice cases this requirement is made mandatory by the Medical Malpractice Review Board and Claims Act of 1975. The Act states that expert testimony in a malpractice case must come from someone licensed to practice in Tennessee or licensed in a state bordering Tennessee. See T.C.A. § 29–26–115(b). This same standard was applied to legal malpractice cases when the court held in *Spalding v. Davis*, 674 S.W.2d 710, 714 (Tenn.1984), that a lawyer's conduct is to be measured against that degree of care, skill and diligence which is commonly possessed and exercised by attorneys practicing in the same jurisdiction. Reiterating the specific connection between the standard of care to be proved in legal and medical malpractice actions, the court in *Cleckner v. Dale*, see *supra* at 540, held

that the evidentiary principles developed in medical malpractice cases are equally applicable to legal malpractice cases. Although *Delmar* may have been a correct statement of the law at the time the decision was written, the Medical Malpractice Review Board and Claims Act and subsequent cases such as *Cleckner* and *Spalding* have removed the standard of care applicable in legal and medical malpractice actions from the realm of "all compensated professionals." We find that the requirement that an expert be familiar with the local standard of care is the exception rather than the rule. We find no cases that apply that exception to the standard of care applicable to engineers and contractors in Tennessee.

■■■ Having read counsels' objections in the record to Weiss' testimony, we find that their objections go to the weight to be given the testimony rather than its admissibility. We must agree with the trial court that engineering principles are the same in Memphis as they would be anywhere else in the world. However, we also understand defendant Saliba's argument that the laws of physics, properties and materials are not the crux of the issue; the issue is the scope of Saliba's responsibilities measured by the standard of care applicable to him as an engineer. However, Weiss' testified that he has been licensed in several other states, he is well versed in the application of failure analysis and he has been involved with a substantial accident in east Tennessee. We agree with the trial court that Weiss is eminently qualified as an expert and the fact that he is not licensed in Tennessee goes to the weight of his testimony. Accordingly we affirm the trial court finding Weiss' testimony admissible.

## 2. TESTIMONY ON FLUME AS UNREASONABLY DANGEROUS

■■■ Defendant Saliba submits that the trial court committed reversible error by allowing various witnesses to testify that the flume was defective and unreasonably dangerous because there was no case against Saliba based on the Tennessee Products Liability Act or a defective or dangerous product. Saliba states that Brian Stephens, plaintiffs' expert witness, testified that the flume was "unreasonably dangerous and that defects caused the structural failure of the waterslide." Stanley Weiss testified that the specifications and materials used with the flume were defective and unreasonably dangerous.

It is true that there is no specific allegation against Saliba based upon the Tennessee Products Liability Act or a defective or dangerous product, but this fact alone does not make such testimony inadmissible because Saliba is not the only defendant. There are claims based on strict liability and a dangerous or defective product against Watkins, Funrides, Almo and Waterslides. We find that such testimony was proper due to the claims against the other defendants. The fact that the trial court directed a verdict in favor of Saliba on the issue of any strict liability or under the Tennessee Products Liability Act renders such testimony not prejudicial. This claim is without merit.

## 3. TESTIMONY OF SALIBA REGARDING WORK HE DID AFTER THE ACCIDENT

■■■ Defendant Saliba argues that the trial court erred by not allowing him to testify regarding the fact that Waterslides hired him to investigate the waterslide after its collapse and paid him $1,200 for his consultation. Saliba submits that such testimony ought to be admitted because it proves the limited scope of his responsibilities in the oral contract he had with Wilkinson & Snowden. Saliba explains that the fact that a separate entity hired him to inspect the waterslide and paid him to do so proves that he was not "the engineer on the job" originally and therefore, he was not responsible for the entire waterslide and specifically not the flume portion. There is lengthy discussion in the record between the trial court and various counsel on this issue and Saliba was allowed to put forth an offer of proof.

Tennessee has adopted Rule 401 of the Federal Rules of Evidence which defines relevant evidence as "evidence having any

tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See *State v. Banks,* 564 S.W.2d 947 (Tenn. 1978). We agree with the trial court that evidence that Saliba was hired after the accident by Waterslides does not make it more probable that he was or was not responsible for the entire waterslide rather than certain portions thereof. We find such testimony irrelevant and this issue is without merit.

### 4. ARGUMENT REGARDING FUTURE WAGE LOSS

Waterslides asserts that the trial court erred by allowing plaintiffs to admit evidence regarding the future wage loss of Williams. At the end of the trial the trial court specifically instructed counsel for Williams not to discuss future earning capacity in his closing argument. Yet, counsel for Williams did touch on the issue of lost future earnings in his closing argument. Defendant Saliba objected at the time Williams made the inappropriate argument and all defendants objected and moved for a mistrial at the close of counsel's argument. The trial court did not grant the motion but rather promised to make a curative instruction to the jury. However, the trial court failed to adequately instruct the jury that they were not to consider lost future earnings in their consideration of damages.

 The plaintiff has the burden of providing a sufficient basis for the jury's computation of damages. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). The plaintiff must present evidence or data from which the amount of probable loss could be ascertained. *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). In other words, the plaintiff may not employ theories that result in proof that is speculative, remote and uncertain but rather the plaintiff must present some approximation of the actual damages so they may be determined with some reasonable certainty by the jury.

The counsel for Williams did not present any evidence on which the jury could rely in determining damages to compensate Williams for any loss of future earnings even though he argued that Williams ought to be compensated for the lost earnings. For that reason it was improper for counsel to argue that the jury ought to consider Williams' loss of future earnings as one element of the damages necessary to compensate him.

 Generally, the trial court controls the arguments of counsel by exercising its sound judicial discretion as to what shall and shall not be permitted in the argument. *J. Avery Bryan, Inc. v. Hubbard,* 32 Tenn.App. 648, 225 S.W.2d 282 (1949). Although the trial court directed Williams' attorney not to discuss future wage loss in his argument, counsel stepped over the boundaries drawn by the court and argued future wage loss to the jury in closing. The defendants objected and asked for a mistrial. The trial court said that the matter would be handled with a curative charge. The appellate court will not interfere with the discretionary action of the trial court in refusing a mistrial unless the argument was unwarranted and put forth in such a way that the prejudice created could not be removed by sustaining the objection of opposing counsel. See *supra, J. Avery Bryan, Inc.* The prejudice created by plaintiffs' inappropriate argument may have been removed by a sufficient curative instruction. However, reviewing the record we find that the trial judge did not give a curative instruction, and therefore, a mistrial would have been appropriate. If a party argues outside the limited subject matter set down by the trial judge, then the trial court must take proper steps to correct any prejudice if possible, otherwise a mistrial is appropriate. A jury verdict which is found to be the product of prejudice solely on the grounds of excessiveness may be cured by remittitur. *Poole v. Kroger Co.,* 604 S.W.2d 52 (Tenn. 1980). Although we do find error in the trial judge's failure to properly instruct the jury, the trial judge did grant a remittitur which we find corrects any prejudice which may have resulted from plaintiffs' inappropriate argument.

## D. DAMAGES

Both plaintiffs and defendants submit issues on appeal regarding the award of damages. In as much as this matter is being reversed and remanded for a new trial, it is unnecessary to discuss the issues relating to damages.

## II. CONTRIBUTION CASE

The third case that was consolidated with the two personal injury cases was an action for indemnity or contribution brought by Waterslides. Waterslides paid a substantial sum in settlements, and subsequently brought an action in May 1982 against ten defendants for indemnity or contribution. Most of the defendants named in Waterslides' action filed responsive pleadings. Three of the defendants were nonsuited. Waterslides sought a default judgment against Almo which the court granted. In June 1988 the trial court entered two orders of judgment in the personal injury case pursuant to the jury verdicts. In both orders the court stated that on May 16, 1988, the court granted default judgments against Watkins, Funrides and Almo. The court also stated that Underwood and Williams shall recover against Funrides, Watkins, Almo, Wilkinson & Snowden, Saliba and Waterslides. On the same day, the court entered an interim order in the contribution case stating that Waterslides was entitled to contribution in the amount of $428,061 from appropriate joint tort-feasors. The court stated that Wilkinson & Snowden and Saliba were appropriate joint tort-feasors, but the court had yet to decide whether to include any of the other defendants. In September 1988 Watkins filed an affidavit alleging that Watkins and Funrides had no assets. In June 1989 the trial court entered an order stating that Waterslides is entitled to contribution, liability for which shall be borne on an equal pro rata basis by Waterslides, Wilkinson & Snowden and Saliba. This order is in accordance with the Contribution Among Tort-Feasors Act. T.C.A. §§ 29–11–101 through 29–11–106. Wilkinson & Snowden and Saliba appeal from this order on the issue of whether the trial court erred in failing to consider the three defendants against whom default judgments were taken in allocating the pro rata shares for contribution. Waterslides raises on appeal the question of whether the trial court erred in not allowing prejudgment interest and attorney fees as part of the recovery.

■■■ This is an issue of first impression in Tennessee as no cases have been decided regarding the role of allegedly insolvent tort-feasors in the application of the Contribution Among Tort–Feasors Act. T.C.A. §§ 29–11–101 through 29–11–106. The trial court ordered that the defendants shall be liable for the stated amount on an equal pro rata basis. The Contribution Among Tort–Feasors Act (the Act) provides for the determination of pro rata shares as follows:

29–11–103. Determination of pro rata shares.—In determining the pro rata shares of tort-feasors in the entire liability:

(1) Their relative degrees of fault shall not be considered;

(2) If equity requires, the collective liability of some as a group shall constitute a single share; and

(3) Principles of equity applicable to contribution generally shall apply.

However, the Act does not address how to handle allegedly insolvent tort-feasors.

Prior to the drafting of the Uniform Contribution Among Tort–Feasors Act or its adoption among the states, many states including Tennessee, followed the theory stated in the Restatement of Restitution § 85 Comment h:

h. Proportionate share where one is unable to contribute. If one or more of a number of co-obligors or co-sureties should become insolvent or leave the jurisdiction, one of the others who makes a payment is entitled by a proceeding in equity to have contribution from the others as if the insolvent or absent persons had originally not participated....

See *Moody v. Kirkpatrick*, 234 F.Supp. 537 (M.D.Tenn.1964); *Tucker v. Nicholson*, 12 Cal.2d 427, 84 P.2d 1045 (1938). Although Tennessee has no cases addressing the issue of insolvent joint tort-feasors since this state adopted the Act, particularly persuasive is a case decided on the issue prior

to adoption of the Act. In *Moody v. Kirkpatrick, supra,* a guarantor who had satisfied a joint obligation brought suit against five of his seven co-guarantors. Notably the district court expressly stated that it was looking to Tennessee law regarding the contribution issue. *Id.* at 542. The problem for the guarantor who sought contribution was that some of the other guarantors lived outside the jurisdiction of the court. The court stated that absence from the jurisdiction is to be handled the same as insolvency for the purpose of apportioning contribution. "The rule in equity based on the maxim that equality is equity, is that the common liability must be apportioned among the solvent co-obligors." *Id.*

Tennessee adopted the Contribution Among Tort–Feasors Act in 1968. But, much like the Uniform Act, the Tennessee Act does not address the issue of insolvent tort-feasors. Regardless of this fact, many states have continued to follow the theory stated in the Restatement of Restitution, *supra,* which is affirmed in the Restatement Second of Torts § 886A Comment C which states that, for example, "when there are three tortfeasors and one of them is clearly insolvent or is beyond the jurisdiction, the amount of contribution fairly allowable between the other two may reasonably be effected and the court may be expected to do what is fair and equitable under the circumstances." See *Manning v. Campbell,* 204 N.Y.S.2d 718 (N.Y.Sup. 1960). What is fair and equitable is more often than not to apportion the contribution among only the solvent tort-feasors. The general rule stated in 18 Am.Jur.2d Contribution § 28 1985, is that in the absence of any agreement to the contrary, contribution ought to be decreed equally among the solvent co-obligors. Numerous courts have adopted this theory when dealing with insolvent joint tort-feasors.

In *Gideon v. Johns–Manville Sales Corp.,* 761 F.2d 1129 (5th Cir.1985), the Fifth Circuit Court of Appeals applied Texas law where the plaintiffs brought action against seventeen defendants for personal injuries suffered from the inhalation of asbestos fibers. The jury returned a verdict against seven defendants. Two of the defendants filed petitions for bankruptcy after plaintiffs filed their claims. The court held that if the two defendants who filed bankruptcy petitions are indeed insolvent, then the solvent joint tort-feasors must bear their portion of the contribution, not the plaintiffs. *Id.* at 1140–41.

Similarly, *In re Porter,* 50 B.R. 510 (E.D.Va.1985) supports this theory. The court applied Virginia law which distinguishes between actions for contribution brought at law and those brought in equity unlike Tennessee, which applies equitable principles. See T.C.A. § 29–11–103(3). The court stated that "an action for contribution in equity proceeds on the equitable maxim that equality is equity and, thus, on the subsequent insolvency of one or more of the co-sureties, those insolvent obligors are not counted as allocating each co-sureties' just proportion of the common obligation." *Id.* at 516.

The Supreme Court of New Jersey followed the same reasoning in *Judson v. Peoples Bank & Trust Co.,* 25 N.J. 17, 134 A.2d 761 (1957). This action was brought by the former stockholders of a corporation for the difference in the price they received in the sale of their stock and the actual value of the shares. The court stated that it would be inequitable to visit upon the plaintiff a further loss by reason of the insolvency of a tort-feasor when nothing suggests that at the time of the settlement the plaintiff knew of the insolvency. The risk of the loss should remain with the other joint tort-feasors. *Id.* at 772.

Alaska has adopted a version of the Uniform Contribution Among Tort–Feasors Act which is very similar to Tennessee's adaptation and Alaska courts have continued the trend. In *Arctic Structures, Inc. v. Wedmore,* 605 P.2d 426 (Alaska 1979), plaintiff brought action against several defendants for injuries suffered when he fell from a platform. The statutory right of contribution in Alaska, like Tennessee, is expressly limited to the pro rata share of the common liability and "no tortfeasor is compelled to make contribution beyond his own pro rata share of the entire liability." A.S. § 09.16.010(b). See also, T.C.A. § 29–11–102(b). The court reasons that when faced with insolvent tort-feasors, the court can either impose the risk of collectability

upon the injured party or upon the other solvent defendants. The court suggests that it would be more equitable to impose such risk on the other solvent defendants, and we agree.

Wilkinson & Snowden and Saliba also assert that the other three defendants which the court did not make liable for contribution are only *allegedly* insolvent and the burden ought to be upon them to prove their insolvency. The general rule is that the insolvency which will permit an application of the foregoing theory is one which has been judicially determined and until such a determination, the presumption is that all joint tort-feasors are solvent. See *Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129 (5th Cir.1985); 18 Am.Jur.2d Contribution § 27 (1985). This is the equitable rule, otherwise all tort-feasors would file affidavits intimating of their insolvency. Therefore, we hold that Watkins, Funrides, and Almo are to be held liable for their pro rata share of the contribution unless, on remand, they present adequate proof for the court to declare them judicially insolvent.

Waterslides raises the issues of whether the trial court erred by denying Waterslides' requests for prejudgment interest and attorney fees. The trial court is vested with a great deal of discretion regarding the allowance of attorney fees and the reviewing court will not interfere except upon a showing of an abuse of that discretion. *Threadgill v. Threadgill*, 740 S.W.2d 419 (Tenn.App.1987). We do not find that the trial court abused its discretion in denying Waterslides' request for attorney fees because defendants assert that they were not notified or involved in a number of the negotiations for which Waterslides now seeks payment.

Likewise, the award of prejudgment interest is within the sound discretion of the trial court and will not be disturbed on appeal unless there has been a clear abuse of that discretion. *Teague Bros., Inc. v. Martin & Bayley, Inc.*, 750 S.W.2d 152 (Tenn.App.1987). We find that the trial court did not abuse its discretion in denying Waterslides' request for prejudgment interest because the period from the time when the settlements were paid until the case went to trial was not in the control of the defendants and they are not responsible for any delay.

This case is remanded to the trial court and the court is directed to instruct the jury regarding issues of contributory negligence, remote contributory negligence and intervening cause, as well as the scope of Saliba's responsibility to Wilkinson & Snowden and the scope of Ebro's testimony. In addition, we order that the three defendants against whom default judgments were taken are to be held liable for their pro rata share of the contribution to Waterslides unless they present adequate evidence for the court to find any or all of them judicially insolvent. On all other issues we affirm.

Costs for this appeal are assessed equally among all the parties who appeared in this appeal.

TOMLIN, P.J. (W.S.), and FARMER, J., concur.