# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
December 7, 2004 Session

## ROBERT STEVEN JOHNSON v. TENNESSEE FARMERS MUTUAL INSURANCE COMPANY

**Appeal from the Circuit Court for Knox County**
**No. 1-106-98     Dale C. Workman, Judge**

---

**No. E2004-00250-COA-R3-CV - FILED MARCH 9, 2005**

---

The issue for jury resolution was whether Tennessee Farmers Mutual Insurance Company refused in bad faith to settle a damage suit against Johnson by Moore within his policy limits of $25,000, and exposed him to a final judgment of nearly $200,000.00. Johnson's defense entirely focused on his asserted non-liability, not withstanding that Moore's medical expenses exceeded $75,000, and his injuries were serious and permanently disabling, thus reasonably indicating that if Johnson was found to be negligent, the percentage of his fault necessarily would have to be minimal in light of his insurance limits. An unidentified van forced Johnson to crash head-on into Moore, and the jury allocated 50% of Moore's damages to Johnson and 50% to the van. After this allocation was affirmed on appeal, Johnson sued Tennessee Farmers Mutual Insurance Company, claiming that Moore's claim could have been settled for his policy limits. Tennessee Farmers Mutual Insurance Company presents a host of issues, beginning with the refusal of the court to direct a verdict, and continuing with complaints of the trial judge commenting on the evidence and refusing corrective jury instructions. The judgment is reversed for the latter two reasons.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded

WILLIAM H. INMAN, SR. J., delivered the opinion of the court, HERSCHEL P. FRANKS, P.J., filed a separate opinion concurring in part, dissenting in part, and SHARON G. LEE, J., filed a dissenting opinion.

John T. Johnson, Jr., Knoxville, Tennessee, and Michael R. Campbell, Chattanooga, Tennessee, for appellant, Tennessee Farmers Mutual Insurance Company.

Bryan L. Capps and Sidney Gilreath, Knoxville, Tennessee, for appellee, Robert Steven Johnson.

### OPINION

A jury determined that Tennessee Farmers Mutual Insurance Company [hereinafter "Tennessee Farmers"] acted in bad faith in failing to settle a lawsuit against the plaintiff filed by

Christopher Moore. The policy issued by Tennessee Farmers provided liability coverage of $25,000 for the plaintiff, far less than the verdict in favor of Moore.

Tennessee Farmers appeals, insisting that its motion for a directed verdict should have been granted, or, in the alternative, that it should be granted a new trial because of the cumulative effect of numerous errors committed by the trial judge in commenting upon the evidence and refusing to give appropriate jury instructions.

We have determined that the trial judge's comments on the evidence require a new trial. We have also determined that the refusal of the trial judge to instruct the jury per the several requests, even when considered in isolation, require a new trial. The cumulative influence of these errors, as hereafter explained, substantially impaired Tennessee Farmers' right to a fair trial.

We are frank to say that the issue of whether the motion of Tennessee Farmers for a directed verdict should have been granted is not simplistic of resolution, but we have concluded that for the reasons hereafter recited the motion was properly denied.

## Overview

This litigation arises from an automobile accident which occurred October 25, 1994, in Knox County, involving a vehicle driven by the plaintiff Robert Steven Johnson [hereinafter "Johnson"], a vehicle driven by Christopher Moore [hereinafter "Moore"], and a white van driven by an unknown [hereinafter "John Doe"] motorist. Both Moore and Johnson were insured under liability policies issued by Tennessee Farmers with minimum limits of liability coverage ($25,000/$50,000) and equal limits of uninsured motorist coverage. Moore filed suit against Johnson and John Doe for his personal injuries. Tennessee Farmers was served as uninsured motorist carrier with respect to Moore's action against John Doe. Johnson filed suit against John Doe. Tennessee Farmers was served with process as uninsured motorist carrier with respect to Moore's action against John Doe.

The actions of both Moore and Johnson against John Doe were settled by Tennessee Farmers paying its uninsured motorist coverage policy limits, under each policy, to each policyholder. The suit by Moore against Johnson resulted in a jury verdict allocating 50% fault to John Doe and 50% to Johnson which resulted in a judgment in favor of Moore against Johnson for $193,750, substantially in excess of Johnson's liability coverage of $25,000.

The lawsuit at Bar was filed against Tennessee Farmers by Johnson alleging that Tennessee Farmers was guilty of bad faith in refusing to settle his case within policy limits.

Tennessee Farmers filed its Answer asserting that it had properly investigated the facts of the accident, and concluded that (1) Johnson was guilty of no negligence in connection with the underlying accident, and (2) that it had retained competent counsel to represent and defend Johnson in the underlying action brought against him by Moore, and (3) had relied upon the advice of the attorney in determining to try the underlying action believing that a jury would not find Johnson

-2-

guilty of any negligence. The jury found that the failure of Tennessee Farmers to settle the case against Johnson evidenced bad faith, and returned a verdict for the excess.

## Standard of Review

Tennessee's traditional standard for reviewing the evidentiary foundation of a jury's verdict is codified in Tenn. R. App. P. 13(d). The rule provides that "[f]indings of fact by a jury in a civil action shall be set aside only if there is no material evidence to support the verdict." Appellate courts employing this standard may not review the evidence *de novo*. *Alexander v. Armentrout*, 24 S.W.3d at 271. Nor may they weigh the proof to determine where the preponderance of the evidence lies. *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994); *Overstreet v. Shoney"s, Inc.*, 4 S.W.3d 694, 718 (Tenn. Ct. App. 1999). Rather, appellate courts must (1) take the strongest legitimate view of the evidence that favors the verdict, (2) assume the truth of all evidence that supports the verdict, and (3) allow all reasonable inferences to sustain the verdict. *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000); *Dickey v. McCord*, 63 S.W.3d 714, 719 (Tenn. Ct. App. 2001). If the record contains any material evidence to support the verdict, the judgment based on the verdict must be affirmed. *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978); *Moss v. Sankey*, 54 S.W.3d 296, 298-99 (Tenn. Ct. App. 2001).

## The Issues

I.      Whether the Court erred in failing to grant Tennessee Farmers' motions for directed verdict.

II.     Whether the Court erred in failing to correctly charge the jury regarding bad faith in accordance with Tennessee Farmers' request to instruct number 4, 6, and 14.

III.    Whether the Court erred in repeatedly allowing plaintiff to introduce evidence relating to the timing of payments by Tennessee Farmers of uninsured motorist coverage benefits to Christopher Moore and Robert Johnson.

IV.     Whether the Trial Court erred in failing to charge the jury in accordance with Tennessee Farmers' request to instruct number 12 that Tennessee Farmers had no duty to make uninsured motorist coverage payments to Christopher Moore and Robert Johnson.

V.      Whether the Court erred in failing to charge Tennessee Farmers' request to instruct number 15 on the validity of the uninsured motorist coverage offset provision in the Moore policy.

VI.     Whether the Court erred by commenting upon the evidence during the testimony of witness Zane Daniel and by stating that Tennessee Farmers' policy issued to Christopher Moore did not contain an uninsured motorist coverage offset provision which would prevent Moore from recovering uninsured motorist coverage after payment of Robert Johnson's liability coverage.

VII. Whether the Court erred in failing to charge Tennessee Farmers' request to instruct number 1 that George Buxton was an independent contractor in his relationship with Tennessee Farmers.

VIII. Whether the Court erred by commenting upon the evidence during the testimony of witness Zane Daniel and in stating that attorney George Buxton represented Tennessee Farmers in the underlying action brought by Christopher Moore against Robert Johnson.

IX. Whether the Court erred by denying Tennessee Farmers' Motion for Mistrial based upon the Court's erroneous comments upon the evidence, including rulings regarding the uninsured motorist offset provision in the Moore policy and regarding Buxton's representation of Tennessee Farmers.

**I.**

We first consider if the record reveals any "material evidence to support the verdict." Rule 13(d) Tenn. R. App. P.

Johnson was driving his small 1982 Mazda RX7 southbound on Highway 33, in Knox County, a four-lane divided highway where the accident occurred. Moore was traveling northbound on a section which was straight with vision unobstructed.

Johnson and Moore were each in the left inside lane of travel. There was a white van in the right southbound lane near Johnson's vehicle. As Johnson started to pass the white van it swerved suddenly into his lane, and Johnson swerved to the left, across the balance of his lane of travel, across the four foot median, and into the oncoming lane of travel where he collided head-on with Moore. Both Moore and Johnson were seriously injured.

The investigating officer confirmed the existence of the white van and included in the accident report the actual lane measurements at the scene. He did not indicate that either Johnson or Moore did anything wrong.

At the time of the accident, adjuster Dennis Ray Hinkle [hereinafter "Hinkle"] was a field claims representative for Tennessee Farmers assigned to investigate the accident. He had been an adjuster with Tennessee Farmers for eighteen years. He confirmed Johnson's coverage, obtained the accident report, took a statement from Johnson, and contacted eyewitnesses which included Tina Marie Miracle, Vickie Linderman and Ray Hall who confirmed that the white van existed; Johnson stated he had been following the van in the right land and just before the collision had decided to pass the van; that the van swerved into Johnson's lane; that there was no contact between Johnson and the van; and that the impact occurred in Moore's lane. Hinkle took no photographs of the scene and made no measurements. On November 8, 1994, fourteen days after the collision, based on this investigation, he wrote a claims summary stating "we will be denying liability as the accident is due to the unknown van setting the entire event into motion."

Shortly after the accident, attorney Zane Daniel [hereinafter "Daniel"] was retained to represent Moore. He wrote to Hinkle on December 21, 1994, enclosing copies of Moore's medical expenses to date and requesting medical payments coverage be extended to Moore. On December 23, 1994, Hinkle wrote to Daniel again stating that Johnson was not legally responsible for the accident.

On October 17, 1995, Daniel filed suit in Knox County Circuit Court on behalf of Moore against Johnson and against John Doe I and John Doe II as the unknown driver and unknown owner of the white van.

In 1995, Johnson retained attorney A.C. Myers [hereinafter "Myers"] for the specific purpose of filing suit against Tennessee Farmers to collect uninsured motorist [hereinafter "UM"] benefits. Tennessee Farmers retained attorney Dennis Jarvis [hereinafter "Jarvis"] to defend the uninsured actions filed by Johnson and Moore. Tennessee Farmers hired George Buxton [hereinafter "Buxton"] to represent Johnson in the *Moore v. Johnson* case. Jarvis filed answers on behalf of Tennessee Farmers in the Moore and Johnson UM claims denying that the white van ever existed. On January 29, 1996, Buxton filed an answer on behalf of Johnson in the same tribunal alleging that the sole cause of the collision was the white van. Jarvis had all the information received by Tennessee Farmers and the information normally provided to attorneys, including the witness statements, at the time he denied the existence of the white van in Tennessee Farmers's answer. Hinkle received copies of all the answers.

Buxton conducted his own investigation. He reviewed the accident report, visited the accident scene, reviewed the statements of Johnson and the three witnesses, took photographs, and met with Johnson five times. In May 1996, Buxton received and forwarded to Tennessee Farmers an offer by Daniel recommending settlement of Moore's claim against Johnson for policy limits.

On August 12, 1996, the discovery depositions of Moore and Johnson were taken by Daniel, Buxton and Jarvis. During the depositions, all counsel learned that Johnson's car was five feet wide; that Johnson did not see Moore's vehicle before impact; that Johnson stated he had just changed into the left lane before the accident while witnesses confirmed that he had been in the left inside lane all along; that his car went 3-5 feet into oncoming lane of Moore; and that Johnson's vehicle was at a 30 degree angle to Moore's vehicle at impact. They also learned in Johnson's deposition that at the time Johnson began his evasive maneuver into Moore's path, the white van was 2-3 feet in Johnson's lane and at most halfway. Buxton summarized the depositions and sent the summaries to Hinkle.

After the depositions, Jarvis reported to Tennessee Farmers that in his opinion the proximate cause of the accident was the John Does white van. He reported that Moore's injuries were extensive and that Moore's medical bills at the time of the depositions were $66,412.35. He reported that Johnson's medical bills were $31,988. He opined that "[i]n lieu (sic) of the real and significant injuries Moore sustained and the amount of medical bills incurred, this may well be a case which it

would be economically expedient to go ahead and pay our UM coverage and get out of this case without incurring additional expense."

On October 21, 1996, nearly two years after the collision, Tennessee Farmers paid Johnson his UM limits of $25,000, which settled Johnson's action against John Doe, leaving the Moore's claim against Johnson and John Doe. Thereafter, attorney Myers wrote Buxton requesting that Johnson's liability coverage limits of $25,000 be paid to settle Moore's claim against Johnson. Initially Johnson and Myers did not want Tennessee Farmers to settle Moore's claim because they wanted to resolve the Johnson UM claim before anything was done on the liability claim of Moore. Ultimately, Myers demanded Tennessee Farmers pay Johnson's liability limits to Moore because he was concerned about an excess judgment, owing to the comparative fault doctrine.

Buxton enquired of Daniel if he would accept Moore's UM limits and execute a release as to Johnson, because Tennessee Farmers would not want to pay Moore his own UM unless it resulted in a complete resolution of *Moore v. Johnson and Doe*. Jarvis testified that Moore's UM claim was not settled at the same time as Johnson's uninsured motorist claim was settled because Moore's case was set for trial at a later date. In any event, the remaining claims of Moore did not settle in 1996, and the *Moore v. Johnson and Doe* case was set for trial February 24, 1997.

During the weeks leading up to trial, there were demands by Myers to settle the claim and offers to accept limits by Daniel. On January 23, 1997, Buxton wrote Tennessee Farmers sending a copy of Myers' letter requesting settlement of the claim against Johnson and stating that Johnson was not guilty of any fault. Buxton recommended that no offer of settlement be made, but stated that he could not guarantee that no fault would be assessed against Johnson.

On February 6, 1997, Daniel wrote Buxton describing Moore's injuries and indicating that he would recommend to Moore that he accept Johnson's policy limits if Tennessee Farmers would also pay Moore his $25,000 UM limits.

Buxton and Jarvis conferred on January 28, 1997 about settlement strategy. At the time, Moore still had pending claims against both Tennessee Farmers (Doe) and Johnson. When Jarvis and Buxton discussed settlement, neither of them knew that if Tennessee Farmers paid Moore the liability limits of the Johnson policy, *Moore would not be entitled to receive his own UM limits under his Tennessee Farmers auto policy*. Before the trial of the case of *Moore vs. Johnson*, Tennessee Farmers agreed to pay Moore his uninsured motorist policy limits of $25,000. A few days before trial, Johnson met with Buxton and inquired about comparative fault. Buxton confirmed to Johnson that a small amount of fault, even 10 percent, would exceed his limits. Tennessee Farmers ultimately made no offer to pay Johnson's liability limits to Moore, and the *Moore v. Johnson* case went to trial on February 24, 1997.

At the trial, the state trooper on whom Tennessee Farmers based its initial decision to deny Moore's claim against Johnson, did not testify, and the accident report was not filed. The pertinent facts of the investigation were stipulated including the weather conditions and that the lanes were

twelve feet wide with a four foot dividing median. There were no medical deposition. Moore's medical expenses were stipulated to be $75,000 and his injuries were not contested. Buxton allowed Daniel to read a summary of Moore's extensive injuries which included a fractured skull and resulting damage to the frontal lobes of his brain; a crushed right eye; broken nose; broken jaws, chipped teeth, upper lip ground off, fingers of his left hand partially ground off, scars on his face, shoulders, hands; a broken back, and loss of hearing in his right ear. He had memory problems, difficulty speaking, vision problems, difficulty playing guitar which he enjoyed and lost sense of smell and taste.

After all proof, Buxton moved for a directed verdict as to Johnson arguing that there was no proof of any negligence by Johnson. The motion was denied and the case went to the jury. The jury initially deadlocked 11 to 1. Buxton discussed the deadlock with Johnson and advised Johnson that he had the right to insist on a unanimous verdict which would result in a a mistrial. Buxton advised Johnson to accept the majority verdict, and Johnson agreed. During the discussions, Buxton told Johnson that accepting the majority verdict was a "serious" or "high stakes" gamble.

After the one hold out juror was excused, the jury announced that they found Johnson at fault, and after further deliberation, announced their verdict that John Doe was 50 percent at fault and Johnson was 50 percent at fault. The jury awarded Moore $387,500 which resulted in a judgment against Johnson for $193,750. After the judgement, Tennessee Farmers paid Johnson's policy limits of $25,000 to Moore.

Hinkle testified that he maintained authority from 1994 through the end of the trial to settle the claim against Johnson. He also had complete authority to settle the uninsured motorist claims of Moore and Johnson. He confirmed that Johnson had "no say" in whether or not Tennessee Farmers settled the case against him. He communicated openly with Buxton about whether or not to settle the various claims all the way up until the time of the underlying trial. He had authorized the settlement of the Moore and Johnson UM claims. Despite Tennessee Farmers's insistence that the van was at fault, Hinkle had no explanation for not paying the UM limits to Johnson promptly. When he received the letter from Myers demanding that Tennessee Farmers pay Johnson's liability limits to Moore, his only discussion with Buxton concerned the fact that they received the letter and none of the facts had changed.

Hinkle employed Buxton and put great weight on his opinion, but conceded that he need not follow Buxton blindly. Buxton had no authority to settle any claim without Tennessee Farmers' approval, but he was authorized to communicate with Daniel regarding Tennessee Farmers' settlement position. He testified that after Buxton was hired, it was not a possibility under the circumstances that Daniel could contact Tennessee Farmers directly to discuss settlement of the claims.

Hinkle knew that he had an obligation as an insurance adjuster for Tennessee Farmers to fully investigate and evaluate all of the facts surrounding a case before making a decision about the merits of the claim. He agreed that a proper evaluation of the Moore and Johnson cases would have

required him to review Buxton's investigation and Buxton's recap of depositions. He received the deposition summaries, but he never read them line by line, and if he read them at all he read them hurriedly.

Hinkle based his original denial on his initial investigation, but realized from the beginning that any award by the jury would be substantial and in excess of Johnson's policy limits. He conceded that if he had considered all of the facts that had been developed in the case, it should have caused him some concern that fault would be assessed against Johnson.

Hinkle testified that the multiple claim files were separated in order to avoid internal conflicts. He did not discuss the cases jointly with Buxton and Jarvis, and denied that the UM claims had any bearing on the decision on whether to pay the liability claim of Moore. He also denied that he told Buxton that Tennessee Farmers could not or would not pay all three claims. But when questioned about the significance of the UM claims versus the liability claim of Moore, he confirmed his belief that Johnson could not have received his own UM benefits and then have his liability paid out on his behalf: "you can't pay the liability portion on behalf of them and then pay his UM. That's the same instance - - it just doesn't work. He is either at fault or he's not."

Hinkle knew that of the three claims only Johnson had any personal assets at stake. He understood comparative fault prior to the underlying trial, and he acknowledged Buxton's advice that there was no guarantee that they would be able to hold Johnson's fault at zero. He knew the jury would be required to consider comparative fault, and he knew the monetary damages would be huge.

He then confirmed that prior to the underlying trial, he knew Tennessee Farmers had two options which would have avoided any possibility of a verdict against Johnson and a bad faith claim. He believed that under the policies Tennessee Farmers could have paid Johnson's liability to Moore and neither Moore or Johnson would have been entitled to UM benefits. He also knew that he could pay Johnson's $25,000 liability limits to Moore thereby eliminating Moore's right to collect his own UM and pay Johnson his own $25,000 UM limits and thus with the same $50,000 he ultimately spent on the UM claims, meet his obligations to both insureds. This action would have released Johnson and prevented the underlying trial. *He believed these options to be true*, and neither was seen in hindsight. He never discussed these options with Buxton.

Hinkle then conceded that the way he chose to pay the payments under the Moore and Johnson policies (two UM payments instead of one UM payment and one liability payment) *guaranteed that there was going to be a trial where Johnson's fault would be compared with the van.* At that trial, Hinkle knew that Johnson would have to be adjudged to have little or no fault to confine the verdict to policy limits.

Daniel testified that he had been a trial attorney since 1965. He testified that he thought Johnson was at fault from his first review of the case because Johnson traveled out of his lane across a four foot median and hit Moore in his lane with no contact between the white van and Johnson's vehicle. He conducted an investigation that included scene review, witness contact, photographs of

the scenes, review of the accident report, measurement of the lanes and median and review of the sight distance had by Johnson. He put little emphasis on the accident report because it was inadmissible, and the officer did not witness the accident. He confirmed that Johnson could see at least 500 yards or one quarter mile straight ahead toward the oncoming Moore vehicle. In addition to these facts he thought it significant from depositions that Johnson's car was narrow at five feet wide. On the issue of whether Johnson was paying attention prior to the collision, Daniel found that (1) Johnson, unlike the eyewitnesses, placed himself in the left lane of travel leading up to the collision, and (2) that Johnson somehow could recall the specific rock group and song playing at the time of the collision.

Based on these facts, Daniel made specific allegations of negligence against Johnson in the *Moore v. Johnson and John Doe I & II* Complaint. He received the Answer from Tennessee Farmers and Jarvis in response to Moore's UM claim *in which Tennessee Farmers inexplicably denied existence of the van fourteen months after collision.*

After the case was filed and Buxton was hired, Daniel did not feel it appropriate to discuss settlement directly with Hinkle, and the offers he made to settle the liability claim against Johnson for policy limits were all communicated through Buxton. He understood Buxton had authority to negotiate the case on behalf of Tennessee Farmers, and he communicated with Buxton about settling Moore's claims both by phone and by letter. He testified that he repeatedly offered to settle the claim against Johnson for policy limits and that he did not make the offer conditional on Tennessee Farmers' payment to Moore of both his UM and Johnson's liability coverage. Shortly before trial, he called Buxton to explain his position in detail as to why Johnson could be found at fault and reiterated that even 10 percent fault on Johnson with a $250,000 verdict would jeopardize Johnson personally.

Buxton testified that in his judgment, Moore and Daniel were only raising two issues to place fault on Johnson: (1) a discrepancy concerning which lane Johnson had been in at a particular point in time and (2) Johnson's recollection of the music on the radio at the time of the accident. Buxton testified that neither issue had any merit based upon his experience, but he realized that a finding of near-zero fault on the part of Johnson would be required to stay within policy limits.

The jury did not agree. The split was 11-1, but Buxton did not know whether that was 11 for Johnson or against him. He explained to Johnson the options, *recommended taking the majority verdict*, but acknowledged that "there was a gamble" in doing that.

Knoxville attorney Thomas Scott [hereinafter "Scott"] testified as an expert witness on behalf of the plaintiff. Scott testified that he was familiar with the standard duties that insurance companies owe their policyholders. He saw nothing wrong with Hinkle's initial denial of Moore's claim against Johnson, but, in his opinion, after depositions had been taken, there was information available to Tennessee Farmers which should have put it on notice that there was significant exposure for an excess judgment, that they should have settled the case, and that the failure to do so was bad faith.

Scott disagreed with Tennessee Farmers's assessment of zero fault and also believed the evaluation process was not complete because Hinkle ignored pertinent facts which should have put him on notice that it was a likely case for an excess verdict. As such, Scott opined that there was inadequate evaluation of comparative fault on the part of Tennessee Farmers. He testified that there was no evidence in the Tennessee Farmers' claim file that they ever considered comparative fault or what would happen if they were wrong about absolute zero fault on Johnson.

He also believed that the relationship between Buxton, Tennessee Farmers and Johnson allowed Tennessee Farmers to give credence to the advice of Buxton but with the caveat that it cannot blindly accept his advice when the lawyer never discusses the possibility of comparative fault. Scott also explained that within the relationship, very little credence should have been given to Johnson's opinion about his own fault because he knew nothing about how he could become liable under the law and facts.

Scott testified that Tennessee Farmers had a duty to act in good faith with Johnson and not to gamble with his rights. In doing so, Tennessee Farmers had a duty to consider how much exposure there was to Tennessee Farmers as opposed to exposure to Johnson if the assessment of fault was wrong. According to Scott, good faith required Hinkle not only to be faithful to Johnson and exercise diligence, which required re-evaluation of Moore's liability claim after the depositions and in light of the failed directed verdict given the massive injuries and pending huge verdict. Scott thought the failed directed verdict motion in the underlying trial was a critical juncture, and Tennessee Farmers should have had a line of communications with Buxton during trial.

Phillip A. Fleissner [hereinafter "Fleissner"], an attorney from Chattanooga, testified as an expert witness for Tennessee Farmers. After reviewing all relevant material, Fleissner believed that Tennessee Farmers's initial denial of the claim was appropriate.

Fleissner believed that Tennessee Farmers had a duty independent of Buxton to investigate and evaluate the *Moore v. Johnson* claim and that duty was continual from beginning to the end of a case. During that continuum, he agreed that as an insurance company, you do not "turn your mind off." He agreed that any fundamental investigation includes consideration of accident scene characteristics such as sight distance, point of impact, and lane measurements. He agreed that it was most important in his evaluation to see if Buxton and Tennessee Farmers had looked at the pertinent fact of the accident. He testified that *McIntyre v. Ballentine*, 833 S.W.2d 53 (Tenn. 1992), did not change Tennessee Farmers' duty of good faith, but it changed "some of the principles of negligence that have to be analyzed and applied when you're evaluating whether a case is one of liability or not, and if it is, how much damages might be given."

He agreed that Hinkle should have reviewed the deposition summaries and/or the entire context of Buxton's communications, but he saw nothing in Buxton's reports to Tennessee Farmers that should have alerted them that continued denial of the claim was improper. Fleissner testified that where an insurance company hires competent counsel for the policyholder, the company should follow the attorney's advice and professional judgment. Fleissner saw nothing in the file which

indicated that Tennessee Farmers should have seen something incorrect or deficient in Buxton's opinion.

Fleissner agreed that $387,500 was a foreseeable verdict given the severity of the injuries to Moore. He also agreed that any fault assessed against Johnson would necessarily be near-zero in order to avoid an excess, and that as the amount of money awarded by the jury increased, any percentage of fault on Johnson must decrease exponentially, considering the $25,000 policy limits.

Fleissner agreed with Hinkle that under the Moore and Johnson policies, if Tennessee Farmers had paid Johnson's liability limits to Moore that Moore would not have been entitled to receive his own UM limits.

Fleissner found no evidence that Tennessee Farmers placed its financial interest ahead of Johnson, and saw no evidence of any motive on Tennessee Farmers' part in denying the claim other than a good faith belief that Johnson was not guilty of any fault and the Tennessee Farmers acted in good faith.

**Analysis**
**I.**

In Tennessee, an insurer is liable in excess of policy limits when it acts in bad faith. A leading case dealing with the issue is *Southern Fire & Cas. Co. v. Norris*, 250 S.W.2d 785 (Tenn. Ct. App. 1952), in which the principle is succinctly described.

> The insured surrenders to the insurer the right to investigate and compromise or contest claims knowing that, in event of a claim, the insurer will have its own interests to consider. But an insured also has a right to assume that his interest will not be abandoned merely because the insurer faces the prospect of a full loss under the policy. The relation is one of trust calling for reciprocity of action. The insured owes the duty of exercising good faith and diligence in protecting the interest of its insured.

The principle was further elaborated in *State Auto Ins. Co. v. Rowland*, 427 S.W.2d 30 (Tenn. 1968):

> An insurer having exclusive control over the investigation and settlement of a claim may be held liable by the insured for an amount in excess of the policy limits if, as a result of bad faith, it fails to effect settlement within the policy limits; and this may be true even through the injured party did not make an offer of settlement within the policy limits. However, in order to prevail in such a case, the

-11-

insured must prove that the failure to settle within policy limits is "fraudulent or in bad faith".

% % % % %

. . . (1) That good faith required the Company to investigate the claim to such an extent that it would be in position to exercise an honest judgment as to whether the claim should be settled; (2) That the material question was not what the actual facts were but what facts relative to the accident and injuries to Davis were known to the insurer and its agents 'which they should have considered in deciding whether it should or should not settle an action brought against the insurer as the reasonable thing to be done'; (3) That a mere mistake of judgment would not constitute bad faith; (4) That while the right of the insurer to control negotiations for settlement must be subordinated to the purpose of the contract to indemnify the insured to the limit of the policy, there must be bad faith which resulting injury to the policy holder before a cause of action accrues; (5) That if the insurer dealt fairly with the insured and acted honestly and according to its best judgment it would not be liable; (6) That it owed its insured no duty to settle merely because a settlement could be made within the limits of the policy.

Tennessee Farmers premised its motion for directed verdict on the basis that Johnson's only argument of bad faith was that: (1) in hindsight, given the facts in *Moore v. Johnson*, the case should have been settled, and (2) it held an honest belief that Johnson would be found zero at fault. The trial judge found both arguments to be without merit and denied the motions.

Johnson argues that the denial of the directed verdict motions was proper because he clearly proved through direct and circumstantial evidence: (1) that Tennessee Farmers had an affirmative duty to deal with Johnson in good faith and place his financial interest at least equal to Tennessee Farmers' own interests; (2) that the standard of care in the insurance industry for discharging that duty required Tennessee Farmers, not Buxton, to honestly, continually and diligently evaluate all of the evidence that would be presented against Johnson at trial including damages; and (3) that Tennessee Farmers fell below the standard of care and breached that duty by, (a) failing to diligently and continuously investigate and re-evaluate all the facts of the accident and damage exposure while blindly relying on advice of counsel, and (b) by failing to place Johnson's interest at least equal to Tennessee Farmers' when deciding how to settle the liability suit against him within the context of Johnson's and Moore's competing uninsured motorist claims and policy.

There is no liability in Tennessee upon an insurer for judgment in excess of the policy limits except in case of bad faith. *Tennessee Farmers Mutual Insurance Company v. Hammond*, 290 S.W. 2d 860 (Tenn. Ct. App. 1956). We are not aware of any reported cases which provides a

-12-

concise definition of bad faith. Most of the cases which deal with the subject of bad faith give guidance as to what is *not* bad faith.

The appellant argues correctly that *negligence alone* is not sufficient to render an insurer liable for an excess verdict. **Southern Fire & Casualty Co. v. Norris**, *supra*. A refusal *to negotiate is insufficient* evidence of bad faith where there was an honest belief on the part of the insurer that the insured's act was not the proximate cause of the accident, and that all liability could be avoided on that basis. **State Auto Ins. Co. of Columbus, Ohio v. Rowland**, *supra*. An insurance company is not guilty of bad faith when *it relies upon the advice and counsel of claim agents, adjusters and eminent lawyers*, based upon facts revealed by careful investigation and careful examination of witnesses, and *has reached the opinion that there is no liability*. **Perry v. United States Fidelity & Guaranty Company**, 359 S.W.2d 1, 22 (Tenn. Ct. App. 1962).

Our Supreme Court has held that it is not bad faith to refuse to negotiate when there was an honest belief that the insured's act was not the proximate cause of the accident and that all liability could be avoided on that basis. **Alford v. National Emblem Ins. Co.**, 469 S.W.2d 375, 378 (Tenn. 1971.

It is clear that the attorney employed by Tennessee Farmers to defend Johnson - George Buxton - was of the opinion that Johnson was not guilty of any negligence and that he would prevail at trial. He, of course, stopped short of a guarantee. It is equally clear that Tennessee Farmers believed that Johnson was not guilty of any negligence and that he not only could - but that he would - prevail at trial. Both were mistaken, as it developed.

Johnson testified that every piece of information he ever gave to Buxton and Tennessee Farmers was that he was not at fault. The investigating state trooper prepared an official accident report, and in the section of the report covering contributing factors, the officer checked "none" for Johnson.

*Tina Marie Miracle* was an eyewitness to the accident, and she gave a statement that the driver of the white van was the sole cause of the accident. *Vickie Linderman* also witnessed the accident, and she gave a statement that had she been in the same position as Johnson when the van moved suddenly to its left, she did not know of any action she could have taken to avoid the accident.

There was another witness listed on the police report by the name of *Michael Ray Hall* who did not actually see the events prior to the accident, but he did hear someone say at the scene that white van changed lanes and forced the sport car driver (Johnson) over. There was no witness who challenged the essential elements of Johnson's version of the accident, and accordingly, the state trooper reasonably assigned no fault to Johnson.

Johnson also employed his uncle, attorney A.C. Myers, to pursue his uninsured motorist claim against John Doe. Before taking of discovery depositions, Mr. Buxton reported to Tennessee

Farmers that Johnson and Myers did not want Tennessee Farmers to settle Moore's claim against Johnson. Discovery depositions were taken in August 1996. Johnson heard nothing at the deposition which indicated he was at fault, and his attorney George Buxton, still believed that 100 percent of the fault was on the white van, and so advised Tennessee Farmers.

We also note the testimony of attorney Dennis Jarvis who was retained by Tennessee Farmers to represent it with respect to the uninsured motorist actions filed by Moore and Johnson. Consequently, Mr. Jarvis' position in the lawsuit was completely opposed to the position of Johnson and George Buxton. If Mr. Jarvis was to be successful in defending the uninsured motorist claims filed by Johnson and Moore, he would have to establish fault on the part of Johnson. As we noted, in the initial answer he filed on behalf of Tennessee Farmers, Mr. Jarvis denied that there was any unknown vehicle involved in the accident, and he denied that John Doe was at fault. But, after taking discovery deposition, Mr. Jarvis was of the opinion that the proximate cause of the accident was the John Doe white van, and this opinion was reported to Tennessee Farmers. Mr. Jarvis recommended to Tennessee Farmers that it pay Johnson his $25,000 in UM coverage. This was done, and later Tennessee Farmers also paid Moore his UM coverage limits before trial.

Before trial, Johnson's attorney A.C. Myers, wrote to Buxton requesting that Johnson's liability coverage limits of $25,000 be paid to settle Moore's claim. Although *initially Johnson and Myers indicated they did not want Tennessee Farmers to settle Moore's claim*, they planned to collect Johnson's UM coverage limits and *then* call upon Tennessee Farmers to settle Moore's claim against Johnson. Upon receipt of the letter, Buxton advised Tennessee Farmers that, in his opinion, Johnson had no liability and recommended that no settlement offer be made to Moore. Specifically, Buxton stated:

> However, my professional opinion as to an evaluation of this case, indicates that Mr. Johnson had no liability in the causation of this accident and should be adjudicated to have zero fault. Where there is no guarantee for that result, I would recommend against any offer of settlement to the Plaintiffs based on the lack of liability of our insured. In all events, please give me a call.

This was the last written communication and advice from Buxton to Tennessee Farmers.

At the time of trial, Hinkle was District Claims Manager for Tennessee Farmers, and he had the authority to settle the claim against Johnson. However, it was his opinion that Johnson was guilty of no fault, and never received any information which indicated Johnson was at fault, or that Johnson had overreacted, or that there were any material discrepancies between the testimony of Johnson and the witnesses.

Tennessee Farmers argues that it had a good faith belief that Johnson was not negligent based upon its own investigation, the conclusion of the state trooper, the testimony and firm opinion of Johnson that he was not at fault, the testimony of independent eyewitnesses, the opinion of an

experienced competent attorney chosen to defend Tennessee Farmers with respect to the uninsured motorist claims, and most importantly, the opinion of the competent experienced attorney who defended Johnson.[1]

Tennessee Farmers argues that there is no evidence that it placed its financial interest ahead of Johnson, and by making the voluntary uninsured motorist payments to Moore and Johnson before trial, Tennessee Farmers ended up paying three (3) times as much as it would have paid based upon the actual jury verdict.

The expert testimony of Thomas Scott, who testified on behalf of Johnson, was simply a 20/20 *hindsight look at the evidence*, which is what this Court does. As heretofore stated, he testified that there was information available to Tennessee Farmers which should have put it on notice that there was *significant exposure* for an excess judgment. Scott further testified that there was inadequate evaluation of comparative fault and that the evaluation process did not seem to be complete, because Tennessee Farmers ignored facts which should have put them on notice that it was a likely case for an excess verdict. It is clear that Scott simply disagreed with the fault assessments of the state trooper, the eyewitnesses, Hinkle, Buxton, Jarvis, and Johnson.

The appellant cites the prophetic words of Judge Avery in the case of ***Perry v. United State Fidelity & Guaranty Company***, *supra*, where he stated:

> There is, as we see it, no way to find the defendant in this case guilty of bad faith, when they have advice and counsel of claim agents, adjusters and eminent lawyers, based upon facts revealed by careful investigation, careful examination of witnesses under the right of discovery of evidence, and have reached an opinion that there is no liability on the part of the carrier of insurance, such as was Mr. Perry in this case, unless we are just simply going to say that whenever the judgment in such case exceeds the amount of the maximum liability carried, the insurance carrier will be liable for it. If we reach that state in our cases, then the insurance companies need not place any amount whatever as a maximum liability in their contracts.

The appellee argues that Hinkle admitted that he based his initial denial of Johnson's liability on his limited, early investigation, and that he merely scanned the discovery depositions which would give him pause to re-think his opinion. Hinkle and Buxton were aware that any award to Moore would - almost certainly - be in greatly excess of Johnson's limits. Hinkle agreed that if he had carefully considered all of the developed facts he would have been concerned as to whether any fault would be assessed against Johnson. Consequently, the appellee argues that Hinkle could not

---

[1] Indeed, so firm was the opinion of Buxton that when the jury hung 11-1, *he agreed, as did Johnson*, to accept a majority verdict. There is, as to Johnson, an extraordinary irony implicit here.

honestly have believed that Johnson had zero fault - he was driving a small sports car, he did not collide with the van, and he veered precipitously to his left needlessly.

While the issue of whether a directed verdict for the defendant should have been granted is close, we think there was "material evidence to support the verdict." Rule 13d, Tenn. R. App. P. We have "commented on the evidence addressed at the first trial", of necessity, somewhat in derogation of the pronouncement of this Court in *Goings v. Active Cas. & Surety Co.*, 491 S.W.2d 847 (Tenn. Ct. App 1972) that if this Court is to reverse and remand for a new trial, it should not comment on the evidence adduced at the first trial. But the appellant presented the issue of material evidence squarely leaving us with no choice but to comment at length on the evidence principally favorable to the appellee.

## II.

We next consider the refusal of the trial judge to charge the following special requests propounded by the appellant:

A.      Mere negligence on the part of an insurance company in failing to settle a claim against its insured is not sufficient to impose liability against the insurance company. Before an insurance company can be held liable for failing to compromise or settle a claim, the refusal to settle within the policy limit must be fraudulent or in bad faith.

B.      Bad faith embraces more than bad judgment or negligence and it imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud, and it embraces an actual intent to mislead or deceive another.

C.      Bad faith on the part of an insurer is a frivolous or unfounded refusal to pay the proceeds of the insurance policy, Such conduct imports a dishonest purpose and means a breach of the duty of good faith and fair dealing through some motive of self-interest or ill will. Mere negligence or bad judgment is not bad faith.

D.      . . . [T]hat Tennessee Farmers did not have any duty to settle or pay the uninsured motorist claims of either Christopher Moore or Robert Johnson unless or until they obtained a judgment against John Doe.

Request A.

This is a correct statement of applicable law. *Southern Fire & Casualty Co. v. Norris*, *supra*. We have reviewed the instructions carefully, the essential boiler-plate language of which

does not encompass this obviously applicable principle to the facts of this case. This special request should have been charged.

Request B.

Tennessee law is clear on the point that negligence or mistaken judgment is not bad faith, which was not defined by the trial judge. ***Southern Fire & Casualty Co. v. Norris***, *supra*, makes it clear that bad faith cannot be equated to negligence, because it is more egregious conduct than negligence and requires a certain definiteness of purpose. The charge did not explain the quantum or essence of conduct which amounts to bad faith; the trial judge merely gave the jury three examples of bad faith. This special request is definitive of the level of conduct required to be proved in order to onerate an insurer with bad faith, and the jury should have been instructed accordingly. ***Carruba v. Transit Cas. Co.***, 443 F3d 260 (Sixth Cir. 1971).

Request C.

What we have said in B, applies with equal force to this requested instruction. *See*, *Black's Law Dictionary*, Sixth Edition.

Request D.

This is a correct statement of applicable law. *See*, Tenn. Code Ann. § 56-7-1201(a). The presentation of prejudicial and irrelevant testimony precipitated this request, which will be discussed hereafter.

Instead, the trial court instructed the jury that bad faith was:

> . . . failure to investigate a claim to such an extent that it would be in a position to exercise honest judgment as to whether a claim would be settled, or two, failure to fairly consider the facts relative to the accident and a claimant's injuries known to it whether they are the actual facts or not and deciding whether the insured should or should not settle, or three, failure of the insured with the right to control the litigation and settlement to fairly consider the rights and interest of the insured as compared to the interest of the insurance company.

This is the charge as it appears in the transcript. If delivered in that fashion, it was undoubtedly confusing. But the main error in the charge was not instructing the jury concerning the essence of conduct which constitutes bad faith.

The rule in this jurisdiction is that the trial judge should instruct the jury upon every issue of fact and theory of the case raised by the pleadings and supported by the proof, and should give every special request which correctly states the law, is supported by the evidence, and is not included in

the general charge. *Spellmeyer v. Tennessee Farmers Mut. Ins. Co.*, 879 S.W.2d 843, 846 (Tenn. Ct. App. 1993). Where the issues are close, as here, correct jury instructions are particularly important. *Hutcheson v. Teeter*, 687 S.W.2d 286, 287 (Tenn. 1985). It was imperative that the jury *understand the meaning of bad faith*; these special requests were couched in clear, understandable, and reasonable language and the refusal of the trial judge to give them prejudiced the adjudicable rights of the defendant. *See, Underwood v. Waterslides of Mid-America*, 823 S.W.2d 171 (Tenn. Ct. App. 1991).

## III.

Tennessee Farmers, as stated, insured the Moore and Johnson vehicles, and also provided UM coverage for both. This UM coverage was paid to both before trial. Johnson was allowed, over objection, to present evidence as to the timing of these UM payments. This was prejudicial error. He was allowed to testify that Tennessee Farmers did not pay his UM policy limits before he filed suit, and plaintiff's counsel was allowed to cross-examine Hinkle with respect to this issue. This testimony served only to obfuscate the issue and prejudice the jury. It had no relevancy whatever on the issue of bad faith.

The trial judge also allowed testimony regarding *timing* of the payment to *Moore* of his UM coverage, the purpose of which seems clear. It suggested a pattern of delay on the part of Tennessee Farmers in the payment of the UM claims of Moore and Johnson as evidence of its alleged bad faith in handling the liability claim against Johnson.

We agree with the appellant that it was error for the court to allow Johnson to suggest there was something improper about the timing of the UM benefits. Tennessee Farmers *had no obligation to pay the UM claims* until there was legal determination of fault, because the policy provides that "We will pay only compensatory damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of . . . ." The applicable statute so provides, Tenn. Code Ann. § 56-7-1201(a).

Any delay in the payment of the UM claims of Johnson was not relevant to the issue of whether Tennessee Farmers was guilty of bad faith in the handling of the Johnson liability claim. Relevant evidence is defined in Rule 401 of the Tennessee Rules of Evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The timing of the payment of the UM claims of Moore and Johnson had no relevance to the issue of whether Tennessee Farmers exercised good faith in the handling of the liability claim of Moore against Johnson. The trial judge finally concluded, when the opinion of the expert witness Scott was sought, that the prejudicial impact of the evidence outweighed its probative value, but we agree that this determination by the court was too late to correct the damage created by the evidence which had been introduced as described by Johnson's counsel "throughout the trial." The trial judge refused Tennessee Farmers' special request for a jury instruction which would have, at least in part, rectified the error.

**IV.**

The *Moore* policy contained an offset provision, as follows:

> Our limit of liability for this Uninsured Motorist Coverage shall be reduced by the sum of the limits payable under all liability and/or primary uninsured motorist insurance policies . . . applicable to the bodily injury. . . of the covered person.

> Damages payable under this coverage to or for covered person shall be reduced by :

>> 1.    The amount paid under the Liability.. Coverages of . . . any other automobile insurance policy;

The appellant submitted the following special request:

> Members of the jury, there has been conflicting testimony about a provision in the *Moore* policy under his uninsured motorist coverage which would have eliminated that uninsured motorist coverage by reason of the payment of Robert Johnson's liability coverage. I instruct you that the offset provision in question is valid. Had Tennessee Farmers first paid to Christopher Moore Robert Johnson's liability coverage limit of $25,000, then Mr. Moore could not have recovered his uninsured motorist coverage, which was also $25,000.

This was a correct statement of the law. Tenn. Code Ann. § 56-7-1201(d); ***Poper v. Rollins***, 90 S.W.3d 682, 687 (Tenn. 2002); ***Erwin v. Rose***, 980 S.W.2d 203, 209 (Tenn. Ct. App. 1992). This instruction was applicable to the plaintiff's theory and the evidence allowed over objection by Tennessee Farmers relating to the timing of Tennessee Farmers' payment of UM coverage benefits to Moore and Johnson. The instruction was inexplicably refused.

Tennessee Farmers contended that it did not place its financial interest ahead of the financial interest of Johnson, because it had paid both Moore and Johnson under the UM coverage of their respective policies when it was not obligated to do so. Tennessee Farmers argued that it believed that Johnson was not at fault, and that its payment to Moore and Johnson under their UM coverage was consistent with this belief.

This special request would have corrected the trial judge's error in stating to the jury *that the Moore policy did not contain an offset provision* which would prevent Moore from recovering UM coverage after payment of Johnson's liability coverage. The failure to give this special request

compounded the court's error in commenting on the evidence and is reversible error. ***Underwood v. Waterslides of Mid-America,*** 823 S.W.2d 171, 178 (Tenn. Ct. App. 1991).

**V.**

The appellant argues that the trial judge commented upon the evidence which clearly cannot be done in this jurisdiction as a matter of constitutional principle. The comment was made after the trial judge allowed Johnson to introduce evidence relating to the timing of the payment of UM coverage to both Moore and Johnson as relevant to the issue of bad faith. A witness for Johnson, Attorney Daniel, was asked if he was aware of the offset provision (heretofore discussed) in Moore's (his client's) policy. Daniel's response was "I don't see how that could be." The trial judge, after some colloquy, then said, in the presence of the jury:

"I hold that's not what the policy provides. Let's move on."

The trial judge then repeated "I hold that's not what the policy provides." In this he was probably misled by attorney Daniel's testimony.

The matter at issue was the offset provision in the Tennessee Farmers' policy issued to Moore, which was clearly relevant to the appellants' contention that it was not financially motivated in refusing to pay Johnson's liability coverage to Moore and instead could have saved itself $25,000 by making such a payment following which the offset provision in Moore's policy would have eliminated his right to UM coverage.

There is a strong policy in Tennessee against a trial judge making statements in the presence of the jury on questions of fact. ***Marress v. Carolina Direct Furniture, Inc.***, 785 S.W.2d 121, 129 (Tenn. Ct. App. 1989). "The constitutional guarantee of a trial by jury requires the judge to be extremely careful **not** to express an opinion on any fact to be passed on by the jury." ***McKay v. Mitchell***, 463 S.W.2d 710, 721 (Tenn. Ct. App. 1970); ***McBride v. Allen***, 720 S.W.2d 459, 462 (Tenn. Ct. App. 1979). "Slight indications of opinion on the part of the judge can have a powerful impact upon the minds of the jury." ***Kanbi v. Sousa***, 26 S.W.3d 495, 498 (Tenn. Ct. App. 2000). A trial judge should do nothing to prejudice the rights of the parties. ***State, ex rel Comm'r v. William***, 828 S.W.2d 397, 403 (Tenn. Ct. App. 1991). Here the trial judge commented on the evidence which was the content of the Tennessee Farmers' policy issued to Moore, and clearly misstated the law. Tenn. Code Ann. § 56-7-1201(d); ***Poper v. Rollins***, 90 S.W.3d 682, 687 (Tenn. 2002). This error was prejudicial. As we held in ***Kanbi***:

> Our judicial system charges the jury with the duty of deciding the facts of the case under the supervision of the judge, while the province of the judge is to "lay down the rules of law governing the parties without bias and without interference in finding the facts." ***McBride v. Allen***, 720 S.W.2d 459, 463 (Tenn. Ct. App. 1979). This separation of functions is mandated by the Tennessee Constitution,

which states in Article VI, Section 9 that "[t]he Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law."

Though a judge is permitted to question a witness, even very slight indications of opinion on the part of the judge can have a powerful impact upon the minds of the jury. *McBride v. Allen*, 720 S.W.2d 459 (Tenn. Ct. App. 1979). Thus, in order to protect the jury's fact-finding role, judges must be very careful about expressing or intimating any opinion on any fact at issue *Graham v. McReynolds*, 90 Tenn. 673, 18 S.W.272 (1891). Improper comments from a judge can, and sometimes do, result in reversal of a judgment. *State v. Suttles*, 767 S.W.2d 403 (Tenn. 1989); *Cleckner v. Dale*, 719 S.W.2d 535 (Tenn. Ct. App. 1986). The comments of the trial judge could be construed as an indication that she had reservations about Ms. Sousa's credibility.

However, not every comment by a judge that can be deemed improper requires reversal. The standard for this court to follow when dealing with allegations of error below are found in the Rules of Appellate Procedure. Rule 36(b) reads "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."

Whether an error should be considered harmless or prejudicial depends in part on how closely balanced the evidence is. If it is very close, then an improper comment by a judge can more easily affect the judgment by tipping the scales in favor of one party or the other. *See State v. Suttles*, 767 S.W.2d 403, 404 (Tenn. 1989).

We have read the entire trial transcript in this case, and we note that the comments objected to did not involve central factual questions. More importantly, we find that the evidence presented of Ms. Sousa's fault was overwhelming, while there was no evidence of any fault on the part of Ms. Kanbi or of any other party, but merely speculation. Under such circumstances, it is highly unlikely that the comments of the trial judge could have affect the jury's verdict. We accordingly affirm that verdict, and the judgment of the trial court.

The evidence in the case at Bar was "clearly balanced"; in fact, were we not forbidden to weigh the evidence, it would be difficult to consent to the judgment. For this reason the case is

decidedly dissimilar to **Kanbi**, *supra.* The evidence was not overwhelmingly favorable to the appellee, and the trial judge's comments cannot be said to be harmless.

**VI.**

Another issue is whether the trial judge erred in further commenting upon the evidence, and in informing the jury in the underlying action of ***Moore v. Johnson*** that attorney Buxton represented Tennessee Farmers Mutual Insurance Company.

The comment occurred during the testimony of attorney Daniel, who represented Moore.

Q:	Did George Buxton, in those conversations that you had with him, represent to you during the discussions about settling that he was speaking for Tennessee Farmers?

MR. JOHNSON:	I object to --

MR. CAPPS:	Goes to state of mind.

THE COURT:	Overruled. Whatever statement he made about this or who he's representing.

THE WITNESS:	He did.

Q:	Without telling me anything about - without telling me anything about this conversation where Moore and the parents were present, what, it any - what, if any, words - what, if any, words in those conversations did he use that represented to you that he was speaking on behalf of Tennessee Farmers?

MR. JOHNSON:	Objection, Your Honor.  He's asking Mr. Daniel --

THE COURT:	Ask him about any statements he made about representing Tennessee Farmers.  Mr. Daniel, by the letter is it clear he was hired by Tennessee Farmers?

THE WITNESS:	I just always took it every thing he did was with Tennessee Farmers --

THE COURT: So, *no specific statements in addition* to that. *Everybody knew he was hired by Tennessee Farmers, right?*

THE WITNESS: What do you mean, Your Honor?

THE COURT: Everybody knew that Tennessee Farmers hired him --

THE WITNESS: Oh, yeah, they --

THE COURT: Okay. Well, ask him about his specific conversation.
    % % % % %

Q: What do you recall about those conversations that led you to believe he was representing – that he was representing Tennessee--

THE COURT: *Everybody knew he was representing Tennessee Farmers.* What's the question about what you want to ask him specifically.

The appellant argues that this error was egregious because the trial judge not only commented on the evidence, but misstated Buxton's position. We agree. The prejudice clearly appears, because here the trial judge told the jury that Buxton was the attorney for Tennessee Farmers, clearly suggesting that he was not looking after the interest of Johnson.

It has long been settled in Tennessee that an attorney hired by an insurance carrier to represent a policyholder is the *attorney for the policyholder*. ***Blaylock and Brown Construction, Inc. v. AIU Ins. Co.***, 796 S.W.2d 146, 155 (Tenn. Ct. App. 1990); Formal Ethics Opinion 85-F-100 (9/30/85). The Supreme Court ***In re Petition of Youngblood***, 895 S.W.2d 322 (Tenn. 1995) held:

> The employment of an attorney by an insurer to represent the insured does not create the relationship of attorney-client between the insurer and the attorney, nor does that employment necessarily impose upon the attorney any duty or loyalty to the insurer which impairs the attorney-client relationship between the attorney and the insured or impedes the performance of legal services for the insured by the attorney.

The Supreme Court further held:

The obligation to defend the insured under a contract of insurance obviously contemplates representation by counsel who can exercise professional judgment and devote complete loyalty to the insured regardless of the circumstances.

895 S.W.2d at 328.  We hold that George Buxton was not counsel for the insurance carrier, but that he was counsel for and represented the policyholder/insured.  *See, **Givens v. Mullikin***, 75 S.W.3d 383 (Tenn. 2000).

The appellant submitted a special request to correct the clear error, but the request was refused.  Rather, the trial judge stated "*I exactly meant to say that*" —  meaning that George Buxton represented Tennessee Farmers when he did not.  He represented Johnson.

The judgment is vacated and reversed and the case is remanded for a new trial.  Costs are assessed to the appellee.

_____
WILLIAM H. INMAN, SENIOR JUDGE