# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### January 20, 2009 Session

## JON THOMPSON, ED GATLIN, AND EMPIRE EXPRESS, INC.
### v.
## J. T. DAVIS AND BARBARA DAVIS

**An Appeal from the Circuit Court for Shelby County**
**No. CT-005998      Karen R. Williams, Judge**

---

**No. W2008-00380-COA-R3-CV - Filed September 8, 2009**

---

This is an action for contribution. The two individual plaintiffs and the defendant formed a limited liability company for the purpose of owning and operating an arena football team. To fund the team, the three investors took out two loans in their individual names. The business was a losing venture, and eventually the team was sold. The proceeds of the sale were used to pay all of the business's debts except the remaining liability on the two personal loans. The two plaintiffs paid the balance of the loans out of their personal funds. The plaintiffs then filed the instant lawsuit against the defendant for contribution, alleging that he was jointly and severally liable for his pro rata share of the debt. The defendant conceded that he owed a small part of the debt, but argued that his liability should be reduced by the amounts distributed to the plaintiffs by the business. The defendant contended that the funds distributed to the plaintiffs should have been applied to the business debt. After a bench trial, the trial court held in favor of the plaintiffs. The trial court rejected the defendant's claim that his debt should be offset, finding that the distributions made to the plaintiffs constituted a repayment of loans, not a distribution of capital. It also awarded the plaintiffs attorney's fees. The defendant now appeals. We affirm the decision of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

John J. Heflin, III, and John Marshall Jones, Memphis, Tennessee, for the appellant, J. T. Davis.

Richard Glassman and Lewis W. Lyons, Memphis, Tennessee, for the appellees, Jon Thompson and Ed Gatlin.

# OPINION

## FACTS AND PROCEEDINGS BELOW

In March 1995, Plaintiffs/Respondents Jon Thompson ("Thompson") and Ed Gatlin ("Gatlin"), along with Defendant J. T. Davis, M.D. ("Davis"), and Davis's son-in-law, Kevin Hunter ("Hunter"), formed a Tennessee corporation called Memphis Arena Football, Inc. The company purchased and operated a franchise football team in the Arena Football League ("AFL") called the Memphis Pharaohs, Inc. In 1996, the corporation was converted to a limited liability company. In 1997 or 1998, Hunter was fired. Hunter's share was bought out by Thompson, Gatlin, and Davis, who then owned the company in equal shares. After that, Gatlin took over the management of the business, and all financial operations and recordkeeping functions were conducted out of his office.

The company operated in Memphis in 1996 and 1997. In January 1998, the company moved to Oregon. The name of the company was changed to Portland Arena Football, LLC, and in 1998 and 1999 it operated as the Portland Forest Dragons. In January 2000, the company moved again, this time to Oklahoma. Its name was changed to Oklahoma Arena Football, LLC, and in 2000 and 2001, its football team operated as the Oklahoma Wranglers. In 2002, the company sold the team back to the AFL for $5.8 million. In that year, the team played in Oklahoma City as a league-owned franchise. After that season, the team's operations were terminated. Hereinafter, because of the sequential name changes to the business, we will refer to the parties' businesses collectively as "the LLC."

Ultimately, the parties' business venture was financially unsuccessful. By the end of 2001, it became necessary for the LLC to borrow funds to keep the business afloat. To accomplish this, the parties took out two loans, the first from Trustmark National Bank of Bartlett ("Trustmark") and the second from First Bank of Lexington ("First Bank").

### *Trustmark Note*

On December 19, 2001, the parties personally borrowed $300,000 from Trustmark. The parties executed a promissory note in their personal capacities in favor of the bank ("Trustmark Note"). By the time the team was going to be sold, the LLC had repaid all but about $18,474 of the Trustmark Note. To pay the remaining balance, Gatlin and Thompson made payments totaling $17,800 to the LLC; the LLC then paid the bank the balance of the Trustmark Note. Davis did not contribute to the payment of the balance due on the Trustmark Note.

### *First Bank Note*

In September 2002, the parties took out a second loan for $2.5 million from First Bank ("First Bank Note"). Contemporaneously, the parties loaned the $2.5 million to the LLC, executing a note that became the collateral for the parties' individual loan from First Bank. The LLC made most of the payments on the First Bank Note. When the team was sold back to the AFL in 2002, $392,122 remained due on the First Bank Note. In December 2003, after this lawsuit was filed, Thompson and Gatlin personally bought the First Bank Note. Thompson and Gatlin then executed

a second note ("the note purchase agreement") in favor of First Bank for the amount of the loan balance. Davis was not a party to the note purchase agreement.

### *Lawsuit Filed*

On October 24, 2003, Thompson and Gatlin (collectively, "Plaintiffs") filed this lawsuit against Davis.[1] The original complaint and the first amended complaint alleged that Davis was liable to the Plaintiffs for contribution to the parties' business under a partnership theory of recovery. In November 2004, the Plaintiffs filed a motion for summary judgment as to liability. The trial court denied that motion on the basis that (a) there was no partnership agreement, and (b) the Tennessee Uniform Partnership Act did not apply because the parties had formed a corporation, not a partnership.

On June 12, 2006, the Plaintiffs filed their second amended complaint. The second amended complaint alleged generally that Davis was liable to the Plaintiffs pursuant to Tennessee Code Annotated § 47-3-116 for contribution of his pro rata share of debts that were owed by all of the parties but paid by only the Plaintiffs. The second amended complaint does not refer specifically to either the Trustmark Note or the First Bank Note; however, the two notes were later identified as the subject of the complaint. On November 28, 2006, Davis filed an answer denying liability to the Plaintiffs. Davis acknowledged that the notes were outstanding, but claimed, *inter alia*, that Gatlin and Thompson caused distributions to be made to themselves from the LLC, giving preference to themselves and depriving the LLC of funds needed to pay the LLC's obligations to Trustmark and First Bank. Therefore, Davis asserted, he is entitled to offset his liability to the extent of any improper distributions. He also claimed that the debt on the Trustmark Note was discharged by the LLC, not by the Plaintiffs. Consequently, Davis claims, they are not entitled to any contribution from the discharge of that debt.

### *Trial*

A bench trial was conducted in this matter on January 18, 2007. Gatlin, Thompson, and Davis all testified at trial, and their depositions were entered into evidence as well.[2]

At the outset of the trial, a copy of the First Bank Note, executed by the parties, was admitted into evidence. Gatlin testified that the funds obtained by the parties from First Bank in exchange for the First Bank Note were loaned to the LLC. The resulting note between the individuals and the LLC then became the collateral for the First Bank Note. When the team was sold, the proceeds of the sale were used to pay all but about $392,122 of the total amount due on the loan. First Bank then

---

[1] In the original complaint, Gatlin's company, Empire Express, Inc., was also named as a plaintiff, and Davis's wife, Barbara Davis, was named as a defendant. On November 22, 2006, counsel for the Plaintiffs confirmed in open court that Empire Express no longer asserted any claim for relief, and that the remaining Plaintiffs no longer asserted any claims against Mrs. Davis. In its final order, the trial court held that all of Empire Express's claims were dismissed, and that all claims against Mrs. Davis were also dismissed.

[2] In recounting the evidence at trial, we will not differentiate between trial testimony and deposition testimony.

asked the parties to purchase the note. Gatlin and Thompson did so by borrowing the $392,122 and executing another note to First Bank. Davis did not participate, nor did he offer to make any payments on the balance of the First Bank Note.

Next, a copy of the Trustmark Note was admitted into evidence. Gatlin testified that he and Thompson each contributed $8,900 to the LLC for the express purpose of supplying funds for the LLC to make the final payment on the Trustmark Note. Gatlin said that he believed that Davis owed one third of that amount as a joint obligee on the Trustmark Note. Gatlin acknowledged on cross-examination that, even without his and Thompson's contributions, the LLC had sufficient funds at that time from which it could have paid off the Trustmark Note.

The LLC's football team operation was generally a losing enterprise, so the parties were periodically required to infuse a substantial amount of their personal funds into the business operations. Gatlin testified that, over the course of operations, when the LLC needed cash to meet its expenses, he would call a meeting of the three LLC members – Thompson, Davis, and him. The parties had "numerous meetings at the Garden Café early mornings to discuss everything that [they] ever put in the corporation and everything that [they] ever took out of the corporation." Early on, all three parties contributed the needed funds equally. In the last three years of the LLC's operation, however, Davis stopped contributing because he did not have the funds. The Plaintiffs offered to buy some or all of Davis's share of the LLC, but he refused, assuring the Plaintiffs that he would repay the Plaintiffs the amounts that they contributed on his behalf. Gatlin indicated that he and Thompson expected to be paid back for the contributions they made in amounts over and above what Davis had contributed. He asserted that the parties had orally agreed that, "if [the Plaintiffs] put X-number of dollars in, as soon as income came in . . . we would pay ourselves back because [Davis] was not contributing at the time."

Relying on this understanding, Gatlin said, he and Thompson made large contributions to the LLC. Gatlin estimated that he and Thompson contributed "over a million dollars apiece more than Doctor Davis . . . even though we were one-third each owners of the corporation." A schedule of contributions to and distributions from the LLC showed that, through December 2002, Gatlin contributed $2,759,617, Thompson contributed $2,645,561, and Davis contributed $1,687,216. Gatlin said that more contributions were made in 2003 and 2004, but these contributions were not included in the schedule.

A spreadsheet was introduced into evidence showing the distributions from the LLC for the period from January 2001 through December 2003. According to the spreadsheet, during that three-year period, Gatlin and his wholly owned businesses (Empire Products or Empire Express) received disbursements of about $229,418, Thompson received $166,845, and Davis received $25,466. Gatlin indicated that the amounts disbursed to him and Thompson were repayments for amounts they had put into the company over and above what Davis had contributed. Gatlin said that he and Thompson trusted that Davis was aware that they were putting money into the LLC for him and that they expected to be paid back, "unless [Davis] thought we were some kin to Santa Claus."

Gatlin testified that he, Thompson, and Davis were aware of all contributions to and distributions from the LLC. He emphasized that Davis knew about "every single one of" the

distributions made to Gatlin and Thompson, and asserted that each disbursement was discussed and agreed upon by all three LLC members. Overall, Gatlin said, he got back less than 10% of what he had contributed to the business. Gatlin noted that Davis never objected to the manner in which the disbursements were made.

Thompson's testimony corroborated Gatlin's testimony. Thompson said that he, Gatlin, and Davis capitalized the arena football business venture by making personal contributions. Thompson said that he personally contributed over $1.5 million to the LLC. The $166,845 that he received in distributions, Thompson claimed, was only about 10% of what he had contributed.

Thompson echoed Gatlin's testimony that, when the business needed money to meet its day-to-day expenses, all three parties would meet and each would put in one-third of the amount of money needed to pay those expenses. In the last several years of the business, however, Davis stopped contributing, explaining to Gatlin and Thompson that he temporarily could not afford to contribute. After Davis stopped contributing, Thompson said, he and Gatlin agreed to contribute to the LLC in equal amounts, covering Davis's share. According to Thompson, Davis apologized profusely to Gatlin and Thompson when he could not contribute along with them, stating that "if you guys will cover for me, I'll pay you back later." However, Davis did not pay any money to either Thompson or Gatlin. Thompson testified that he and Gatlin paid off the Trustmark Note by each contributing $8,900 to the LLC, and in turn the LLC paid the note. Thompson maintained that Davis was included in all discussions about the LLC finances until the very end.

Davis testified as well. He recalled the meetings with Thompson and Gatlin about LLC business as being quite informal. Davis described the LLC meetings as "more of a social function because we never had minutes, we never had documentation of an expense account, et cetera . . . ." On most occasions, Davis said, Gatlin simply informed him that Gatlin and Thompson had contributed money to the LLC in order to meet expenses. Davis did not remember any details about the contributions, not even his own. He conceded that Gatlin called him "more than two" times to ask for contributions to help meet LLC expenses, but Davis sometimes did not have the financial resources to contribute. On those occasions, Gatlin assured Davis that he need not worry because he (Gatlin) and Thompson would cover the shortfall. Davis claimed that Gatlin told him that, when the team was sold, he and Thompson would be reimbursed from the proceeds from the sale of the team for amounts they paid over and above what Davis contributed, with any remaining proceeds of the sale divided equally among all three of them. Davis did not know how much Gatlin and Thompson contributed over the course of the business, as he had seen no documentation on it. Based on what Gatlin had told him, however, he knew their contributions were substantial. When asked how much he himself had contributed, Davis responded, "It got so depressing for me, I never kept up with it." Davis agreed, however, that his contribution totaled less than $1.5 million.

Davis said that, when he was first shown the spreadsheet of the LLC's distributions that was submitted into evidence, he was "shocked" at what had been paid out to Thompson and Gatlin. Davis claimed that the parties had never had any discussions about those distributions, and that he had no knowledge of them. Davis did not remember the LLC making any distributions to him, but he had not checked his own bank records to see whether he had correlating deposits in his account. Davis stated that he claimed the LLC's business losses on his income tax return in accordance with

the K-1 form provided to him by the LLC, even for years in which he had put no money into the business.

Davis was under the impression that he had signed the First Bank Note and the Trustmark Note in his capacity as a shareholder of the corporation, though he acknowledged that neither note contained language indicating that he was signing only as a shareholder. He testified that both notes should have been totally paid off from the proceeds of the sale of the team. Davis admitted, however, that the terms of both notes required the LLC members to personally pay the notes if they were not paid by the LLC.

When the team was sold, Davis said, he did not know how much was remaining on the First Bank Note because he received virtually no financial information from the LLC. Davis had no evidence that the balance claimed by the Plaintiffs was incorrect. Davis said that he was not aware that First Bank had called the note. Davis claimed that Gatlin never called him about this and never asked him to make payments on the First Bank Note. Davis insisted that he did not owe any money to either Gatlin or Thompson. If he owed any money, Davis said, he owed it to the LLC.[3] At the conclusion of the proof, the trial court took the matter under advisement.

On January 17, 2008, the trial court entered an order awarding the Plaintiffs a judgment of $136,640.97, one third of the total balance on both the Trustmark and First Bank notes. In reaching its conclusion, the trial court made the following findings of fact:

> 3. All three men signed a promissory note with Trustmark National Bank on December 19, 2001, in the amount of $300,000. . . . Although Defendant Davis believed he was signing as a member of the Limited Liability Company, his signature on the document does not show that he signed in any other capacity than personally. Defendant Davis admitted that he did not read the document before signing. The borrowers are identified at the top of the first page of the document as Ed H. Gatlin, J.T. Davis, M.D., and Jon Thompson. There is no mention of the Memphis Pharaohs L.L.C. All three men were jointly and severally liable to the Bank on this note which came due on May 31, 2002.
>
> 4. On September 20, 2002, the three men again borrowed money to fund the football team. . . . They each signed the $2.5 million promissory note to First Bank of Lexington, Tennessee. The loan was secured by a note from the Oklahoma Arena Football. Again, the men signed in an individual capacity rather than a corporate capacity and they were jointly and severally liable on the loan.
>
> 5. For a period of time, all three men continued to financially support this losing venture. Eventually Defendant Davis quit making further contributions. This forced

---

[3] However, counsel for Davis conceded during trial that Davis owed the Plaintiffs his pro rata share of the difference between the amount due on the First Bank Note ($392,122) and the amount of excess distributions to Gatlin and Thompson ($345,332); in other words, one-third of $46,790, or $15,596.67.

Plaintiff Thompson and Plaintiff Gatlin to fund their own share of the expenses and Defendant Davis's, also to pay the bills of the LLC as they became due. They fired Kevin Hunter because he was using cocaine, moved the team from Memphis to Portland, Oregon and changed its name. Plaintiff Gatlin began managing the team because he had more time available then. Eventually they sold the team to the Arena Football League for $5.8 million in 2003 or 2004. They used this money to pay off the debts of the LLC. Defendant Davis declined to participate in paying off the debts.

6. On December 19, 2001, Plaintiff Thompson and Plaintiff Gatlin, to reduce the costs of the LLC, bought the $2.5 million note from First National Bank for $392,122.91. . . . Defendant Davis offered no proof that this figure is incorrect. Defendant Davis benefitted from this transaction as collection costs were avoided and the late fees of $45,000 were waived.

7. The remaining balance due on the Trustmark Note is $17,800.00. Periodically, payments were made by the LLC on this account funded by deposits from Plaintiff Thompson and Plaintiff Gatlin. Defendant Davis made no payments to retire this debt.

8. In their testimony, Plaintiff Thompson and Plaintiff Gatlin referred to their additional funding of the LLC as capital calls. This designation is no more binding on the Court than Defendant Davis's designation of his signature as being in a corporate capacity. The funds paid into the LLC by Plaintiff Thompson and Plaintiff Gatlin functioned as loans to keep the business afloat until a sale could be worked out. Thus, the argument that Plaintiff Thompson and Plaintiff Gatlin improperly received more money from the LLC than did Defendant Davis is not persuasive. Defendant Davis failed to live up to his bargain to equally financially support the team and he misled Plaintiff Thompson and Plaintiff Gatlin about the suitability of Kevin Hunter to manage the team. But for Plaintiff Thompson's and Plaintiff Gatlin's continual infusion of money into the LLC, Defendant Davis would find himself in worse financial condition than he is presently.

9. Although this case was initially pled on another theory, it was tried as a Suit on two promissory notes. Defendant Davis was personally liable on each for one third. The Court awards Plaintiff Thompson and Plaintiff Gatlin a judgment in the amount of $136,640.97 ($392,122.91 + $17,800/3) plus court costs.

Thus, the trial court held that Davis was liable to the Plaintiffs for one-third of the balance on the Trustmark Note and one-third of the balance on the First Bank Note. The trial court rejected Davis's claim that his liability on the First Bank Note should be offset by distributions made to the Plaintiffs, finding that the distributions by the LLC constituted the permissible repayment of loans. It also found that the LLC payments on the Trustmark Note were funded by the Plaintiffs, which entitled them to contribution from Davis. In a separate order, the trial court awarded the Plaintiffs $35,000

in attorney's fees and expenses, pursuant to the terms of the notes.[4]  Davis now appeals the trial court's judgment in favor of the Plaintiffs, including its award of attorney's fees.

ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Davis argues that the trial court erred in finding him liable for his pro rata share of the total remaining balances on the First Bank and Trustmark Notes.  He further argues that the trial court erred in awarding the Plaintiffs any attorney's fees incurred prior to the filing of the amended complaint on June 12, 2006.

Because this case was tried by the trial court without a jury, we review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise.  ***Squib v. Smith***, 948 S.W.2d 752, 754 (Tenn. Ct. App. 1997); Tenn. R. App. P. 13(d).  To the extent that the trial court's factual determinations were based on its assessment of witness credibility, we will not reevaluate that assessment absent clear and convincing evidence to the contrary.  ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002).  We review the trial court's conclusions of law *de novo*, with no presumption of correctness.  ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000).  The amount of an award of attorney's fees is necessarily a matter for the trial court's discretion, and we will not reverse a trial court's attorney's fee award absent an abuse of that discretion.  ***Keith v. Howerton***, 165 S.W.3d 248, 250-51 (Tenn. Ct. App. 2004).  The trial court abuses its discretion when it "either applie[s] an incorrect legal standard or reache[s] a clearly unreasonable decision, thereby causing an injustice to the aggrieved party."  ***Id.*** (quoting ***Kline v. Eyrich***, 69 S.W.3d 197, 204, 209 (Tenn. Ct. App. 2002)).

ANALYSIS

*Contribution*

Tennessee Code Annotated § 47-3-116(a) authorizes an action for contribution when one party having joint and several liability on a note pays the entire instrument:

(a) Except as otherwise provided in the instrument, two (2) or more persons who have the same liability on an instrument as makers, drawers, acceptors, endorsers who indorse as joint payees, or anomalous endorsers are jointly and severally liable in the capacity in which they sign.

(b) Except as provided in § 47-3-419(e) or by agreement of the affected parties, *a party having joint and several liability who pays the instrument is entitled to receive from any party having the same joint and several liability contribution in accordance with applicable law.*

---

[4]Counsel for the parties was informed of this attorney's fee award in a letter from the trial judge dated January 7, 2008, which was incorporated in the trial court's January 17, 2008 order by reference.

-8-

(c) Discharge of one party having joint and several liability by a person entitled to enforce the instrument does not affect the right under subsection (b) of a party having the same joint and several liability to receive contribution from the party discharged.

Tenn. Code Ann. § 47-3-116 (2001) (emphasis added). "The right to contribution is the right of a person who has discharged a common liability or burden to recover of another, who is also liable, the portion he or she ought to pay or bear." 18 AM. JUR. 2D § 1 (2004). The right to contribution is based on equitable principles:

> The doctrine of contribution is founded upon principles of equity and natural justice, rather than of contract law. *TRW-Title Ins. Co. v. Stewart Title Guar. Co.*, 832 S.W.2d 344, 346 (Tenn. Ct. App. 1991); *Esstman v. Boyd*, 605 S.W.2d 237, 241 (Tenn. Ct. App. 1979). It applies where the parties share a common obligation or liability, but one party has paid more than its proper share of the obligation. *Squibb v. Smith*, 948 S.W.2d 752, 754 (Tenn. Ct. App. 1997); *Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d 171, 186 (Tenn. Ct. App. 1991); *Winebarger v. Winebarger*, 653 S.W.2d 746, 748-49 (Tenn. Ct. App. 1983). The right to contribution among contract debtors does not arise until one of them actually pays more than its fair share of the joint obligation. *Young v. Kittrell*, 833 S.W.2d 505, 508 (Tenn. Ct. App. 1992); *Esstman v. Boyd*, 605 S.W.2d at 241.

*First Nat'l Bank of Chicago v. Cumberland Bend Investors, L.P.*, No. M2000-00001-COA-R3-CV, 2002 WL 31835693, at *4 (Tenn. Ct. App. Dec. 19, 2002). Based on the law of contribution, the trial court held that Davis was liable for his pro rata share of the payments made by the Plaintiffs on both the First Bank and Trustmark Notes.

Davis first argues that the trial court erred in failing to offset his obligation on the First Bank Note by the $345,332 in allegedly improper distributions made to the Plaintiffs as reflected on the spreadsheet admitted into evidence at trial. In support of this contention, Davis claims that the evidence preponderates against the trial court's finding that the distributions constituted repayment of loans; he asserts that they instead constituted distribution of capital. Consequently, because the distributions of capital were unequal among the members of the LLC, and because the distributions rendered the LLC unable to make the payments on its debt to First Bank, the distributions violated Tennessee Code Annotated §§ 48-236-101,[5] 48-236-105(a),[6] and other statutes related to the operation of LLCs. Therefore, Davis argues, the amount of the total debt owed on the First Bank Note ($392,122) should have been offset by these improper distributions ($345,332), and his liability

---

[5] This statute provides that, "[u]nless otherwise provided in or through the articles or operating agreement, distributions of cash or other assets of an LLC, including distributions on termination of the LLC except as provided in § 48-245-1101, must be allocated equally among the members." Tenn. Code Ann. § 48-236-101 (2002).

[6] This statute provides that "[n]o distribution may be made by an LLC if, after giving effect to the distribution . . . [t]he LLC would not be able to pay its debts as they became due in the normal course of business," or "the LLC's total assets would be less than the sum of its total liabilities . . . ." Tenn. Code Ann. § 48-236-105(a) (2002).

should have been limited to his pro rata share of the difference ($46,790), or $15,597.[7] With respect to the Trustmark note, Davis claims that he is not liable to the Plaintiffs for contribution, because they did not personally pay off that note. Rather, the undisputed evidence shows that the LLC, not the Plaintiffs, paid that debt.

In response, the Plaintiffs claim that the evidence preponderates in favor of the trial court's finding that the distributions to them constituted repayment of loans and that, therefore, the statutes upon which Davis relies are inapplicable. Even if the distributions were considered to be distributions of capital, the Plaintiffs contend, Davis is not entitled to a credit for wrongful distributions, because the statutes provide no right to credit against the debt that arose out of their joint and several liability on the bank notes. Furthermore, they argue, even if the distributions were wrongful and Davis were otherwise entitled to a credit, Davis's defense was raised more than three years after the date of the most recent distribution. *See* Tenn. Code Ann. § 48-237-101(d) (2002) (stating that members receiving or assenting to improper distributions have no liability for such distribution after three years from the date of the distribution). In light of the three-year limitation on such a claim, they assert, Davis is barred from "attempting to recover through the back door what the law clearly precludes him from recovering through the front door." The Plaintiffs also claim that the evidence preponderates in favor of the trial court's conclusion that the two $8,900 payments made by them to the LLC were made to the LLC for the purpose of satisfying the Trustmark Note. Therefore, because these payments were made for this express purpose, the Plaintiffs are entitled to contribution from Davis.

As a threshold issue, we must determine whether the evidence preponderates in favor of the trial court's finding that the distributions made to the Plaintiffs constituted repayment of loans they made to the LLC. The parties cited no case law illuminating the distinction between a capital contribution and a loan. BLACK'S LAW DICTIONARY defines "capital contribution" as "[c]ash, property, or services contributed by partners to a partnership," or "[f]unds made available by a shareholder, usu. without an increase in stock holdings." BLACK'S LAW DICTIONARY 201 (7th ed. 1999). In contrast, "loan" is defined as "[a]n act of lending; a grant of something for temporary use," and "[a] thing lent for the borrower's temporary use; esp., a sum of money lent at interest . . . ."[8] *Id.* at 947. In all cases a loan involves a borrower and a lender who expect repayment, with or without consideration or interest. *See id.* at 947-48.

In the case at bar, by the account of all parties, the LLC was conducted in a highly informal manner. The only evidence regarding the nature of the Plaintiffs' payments to the LLC and the distributions therefrom is the parties' testimony. Gatlin testified that he and Thompson contributed to the LLC over a million dollars apiece more than Davis over the course of the business. The schedule of payments shows that, by the end of 2002, they had both contributed over $900,000 more than Davis. This testimony was not disputed by Davis, who professed to have little knowledge of

[7]On appeal, Davis does not dispute that he may be liable to the Plaintiffs for some contribution on the First Bank Note, but argues only that the allegedly improper distributions entitle him to an offset.

[8]BLACK'S LAW DICTIONARY defines forty different types of loans. BLACK'S LAW DICTIONARY 947-48 (7th ed. 1999).

the LLC's finances because it became "so depressing."  Gatlin asserted that the parties had an oral agreement that the LLC would repay the Plaintiffs for these excess contributions as it obtained sufficient funds; both Gatlin and Thompson said that the amounts distributed to them constituted repayments, and altogether were only about 10% of the total loaned to the LLC by the Plaintiffs. Thompson testified that Davis apologized for failing to contribute and promised to pay back the Plaintiffs for their excess contributions.  It is undisputed that the Plaintiffs' excess contributions did not lead to an increase in their share of the business, which would have indicated that their contributions to the LLC were intended to be capital contributions rather than loans.  On the other hand, in their testimony, Gatlin and Thompson at times referred to their contributions as "capital contributions" or "capital calls."  Thompson testified that the business was "capitalized" with contributions from the parties.  In addition, there is no loan documentation, nor any evidence that the Plaintiffs charged interest to the LLC for any loans.  Davis's testimony again does not enlighten; he testified only that Gatlin told him that the excess contributions by Gatlin and Thompson would be repaid from the proceeds of the eventual sale of the team.

Overall, considering the record as a whole, we cannot conclude that the evidence preponderates against the trial court's conclusion that the distributions made to the Plaintiffs by the LLC constituted repayment of loans made to the LLC by the Plaintiffs.  It is undisputed that all of the parties in this case were aware that the Plaintiffs made excess contributions, that they were effectively covering for Davis, and that all the parties expected that the Plaintiffs would be repaid. Thus, this finding by the trial court is affirmed.

We also find that the evidence preponderates in favor of the trial court's conclusion that the Plaintiffs personally discharged the debt on the Trustmark note.  We recognize that the actual check written to Trustmark came from the LLC.  However, the undisputed evidence shows that the Plaintiffs each wrote checks for $8,900, approximately half of the amount due, around the time of the final payment, and that this money was intended for, and was actually used for funding the Trustmark Note payoff.  This finding, therefore, is also affirmed.

In light of these factual findings, we agree with the trial court that the doctrine of contribution must apply in this situation, where the Plaintiffs paid more that their share of the parties' joint obligations.  This holding allows for recovery by the Plaintiffs against Davis, who benefitted from the Plaintiffs' payments. ***See First Nat'l Bank of Chicago***, 2002 WL 31835693, at *4.  Therefore, Davis owes the Plaintiffs his pro rata share of the remaining debts on both notes that were satisfied by the Plaintiffs, and this holding by the trial court is likewise affirmed.

### *Attorney's Fees*

Finally, Davis argues that the trial court erred in awarding the Plaintiffs $35,000 in attorney's fees.  He points out that any liability he has for attorney's fees arises from the language in the two notes.  However, the first two and a half years of this litigation did not relate to recovery on the notes. Rather, the Plaintiffs' initial and first amended complaints, based on theories of partnership and fraud, were resolved in his favor.  Only when the second amended complaint was filed on June 12, 2006, was recovery sought on the First Bank Note and Trustmark Note.  Therefore, Davis contends, the fees generated by Plaintiffs' attorney prior to that date, including the depositions of

the individual parties, were in pursuit of theories upon which the Plaintiffs had no right of recovery of attorney's fees, even if they had prevailed on those theories. While Davis acknowledges that he may bear some liability for fees and costs incurred after June 12, 2006, he maintains that he has no liability for fees incurred before that date. In response, the Plaintiffs assert that much of the pre-June 2006 discovery was on the nature of the business, the parties' relationships, and the liabilities of the LLC, including the notes at issue, and thus was useful in the Plaintiffs' ultimate recovery on the notes. They argue that, under the circumstances, the trial court acted well within its discretion in its attorney's fee award.

The trial court held a hearing on May 25, 2007, to consider the parties' arguments regarding attorney's fees. In the hearing, the Plaintiffs submitted the affidavit of their trial counsel, who charged a total of $46,008.70 in legal fees and expenses for his services in the litigation. The trial court considered the parties' arguments and the affidavit and determined that a $35,000 fee, about 76% of the total requested, was appropriate. The trial court explained, "The argument that much of the work was done on the first two versions of the complaint has merit but so does the argument that ultimately Plaintiffs prevailed with a judgment of $136,640.97." It is undisputed that, under the terms of the notes at issue, the Plaintiffs are entitled to recover their attorney's fees. As noted above, the amount of the fee to be awarded is within the trial court's sound discretion. ***Keith***, 165 S.W.3d at 250-51. From our review of the entire appellate record, we conclude that the trial court did not abuse its discretion in awarding the Plaintiffs $35,000 in attorney's fees.

**CONCLUSION**

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant J. T. Davis and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE